STATE of Wisconsin, Plaintiff-Appellant-Cross-Respondent,†

v.

Kenneth M. HERRMANN, Defendant-Respondent-Cross-Appellant.

Court of Appeals

*Nos. 99–0325–CR, 99–0589–CR. Submitted on briefs December 14, 1999.—Decided January 19, 2000.*

## 2000 WI App 38

(Also reported in 608 N.W.2d 406.)

†Petition to review denied.

137

On behalf of the plaintiff-appellant-cross-respondent, the cause was submitted on the briefs of *James E. Doyle*, attorney general, and *Susan M. Crawford*, assistant attorney general.

On behalf of the defendant-respondent-cross-appellant, the cause was submitted on the brief of *Peter J. Morin* of Menomonie.

Before Cane, C.J., Hoover, P.J., and Peterson, J.

¶ 1. CANE, C.J. The State of Wisconsin appeals from that part of an order granting Kenneth Herrmann's motion to suppress evidence. Herrmann cross-appeals from the part of the order denying his motion to suppress evidence.[1] The State argues that the trial court erred by suppressing certain statements and evidence because: (1) Herrmann's incriminatory

---

[1] Upon the State's notice of appeal and Herrmann's petition for leave to appeal, this court ordered that the appeals be consolidated and that Herrmann be designated as the respondent-cross-appellant.

statements and consent to the disclosure of marijuana located under a couch were voluntarily given; and (2) even if Herrmann did not voluntarily consent to a limited search of his apartment, there was sufficient untainted evidence to support the warrant under which his apartment was later searched. On cross-appeal, Herrmann argues that the trial court erred by admitting into evidence nine marijuana plants found as a result of the initial warrantless search of his apartment.

¶ 2. Because the officers, though mistaken, reasonably believed that they were still executing a valid search warrant on an adjacent apartment when they discovered the nine marijuana plants in Herrmann's apartment, we affirm that part of the circuit court's order admitting the nine marijuana plants into evidence. Further, because the officers were required to cease all searching once they reasonably believed that they were no longer operating within the scope of the search warrant, we affirm that part of the circuit court's order suppressing Herrmann's incriminating statements and evidence seized from under the living room couch. Finally, because there was sufficient untainted evidence to support the search warrant issued for Herrmann's apartment, we reverse that part of the circuit court's order suppressing all evidence obtained as a result of the subsequent search pursuant to a warrant. Therefore the order is affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion.

## BACKGROUND

¶ 3. On April 9, 1998, Dunn County law enforcement officers executed a search warrant for Tracy Landis's apartment. Landis's apartment was located

adjacent to Herrmann's apartment on the second floor of a multi-unit building. At the suppression motion hearing, investigator Russell Cragin and West Central Drug Task Force volunteer Ed Frawley testified that at the time they executed the warrant, they did not know that there was more than one apartment on the second floor. The officers further testified that Landis's apartment was large and contained many rooms. Frawley further compared the apartment's layout to that of a catacomb, with rooms leading to other rooms. The officers discovered approximately five pounds of marijuana in the closet of what was described as the sewing room.

¶ 4. Both Cragin and Frawley testified that directly to the right of the closet containing the marijuana, they encountered another closed door, secured only with a chain lock.[2] In the officers' continued execution of the search warrant on Landis's apartment, they unchained and opened the door, which swung toward them. The officers passed through the door into what they thought was a storage room for Landis's apartment. The officers described the room as being full of "junk." When asked why he believed the "storage room" was still in Landis's apartment, Cragin testified:

> It was just another storage room. There [were] so many rooms in her apartment; that door was adjacent to the other door—I mean it was a 90-degree wall. In one closet door we find approximately five pounds of marijuana. Naturally we're going to open up the next closet door, in which we

---

[2] Although Cragin's hearing testimony intimates that he thought the door led to another closet, Frawley testified that he did not know where the door would lead. The distinction, however, seems insignificant as the officers testified that the layout of Landis's apartment was such that rooms led into other rooms.

observed a—what I for lack of better words called a storage room, which we did enter to search for more drugs or illegal property.

Once in the "storage room," the officers opened the door to a closet and saw what they believed to be a marijuana grow operation consisting of nine withered marijuana plants.

¶ 5. The officers then walked through the "storage room" to a hallway and proceeded down the corridor. Upon discovering a bathroom on the corridor's right-hand side and a kitchen at the end of the hallway, the officers claimed they suspected for the first time that they were no longer in Landis's apartment. Once in the kitchen, Cragin repeatedly yelled, "sheriff's department, search warrant." The officers then made contact with Herrmann, who emerged from a darkened room off of the kitchen.

¶ 6. Cragin asked Herrmann if he lived with Landis, to which Herrmann replied that he did not. Cragin then asked if they were standing in Landis's apartment, to which Herrmann replied that they were not and that Landis lived next door. Cragin advised Herrmann that they had discovered withered marijuana plants in the storage room's closet and asked if the storage room was located in his or Landis's apartment. Herrmann replied that it was his apartment. Cragin detected a strong odor of marijuana and then asked Herrmann if he had any marijuana in the apartment, to which Herrmann answered that he did. Cragin asked Herrmann if he would turn the marijuana over to him and Herrmann subsequently led Cragin to the living room, indicating that the marijuana was under the couch. Cragin recovered approximately one ounce of marijuana and related drug paraphernalia from under the couch.

¶ 7. Cragin then told Herrmann that he smelled raw marijuana and asked Herrmann if he had any marijuana growing in his apartment. Herrmann intimated that he did, but then denied Cragin's request for consent to search the apartment. Herrmann was thereafter placed under arrest and a search warrant was obtained for his apartment, based on the discovery of the marijuana grow operation in the storage room's closet, Herrmann's incriminatory statements, the marijuana from under the couch and Cragin's ability to detect the smell of raw marijuana while standing in the kitchen. While executing the search warrant on Herrmann's apartment, officers discovered approximately fifty more marijuana plants and a "sophisticated" marijuana grow operation.

¶ 8. Herrmann was charged with one count of unlawfully manufacturing a controlled substance and one count of unlawfully possessing a controlled substance, contrary to WIS. STAT. § 961.41(1)(h)2 and (3g)(e).[3] Herrmann moved the circuit court to suppress all statements and physical evidence seized from his apartment. The circuit court subsequently ordered the suppression of all statements and evidence obtained from Herrmann's apartment except for the nine marijuana plants found in the closet adjacent to Landis's sewing room.[4] This appeal and cross-appeal followed.

---

[3] All references to the Wisconsin statutes are to the 1997–98 version unless otherwise noted.

[4] The circuit court's written order suppressed "all statements and evidence obtained from [Herrmann's] apartment except nine marijuana starter plants found in the room adjacent to the sewing room of the Tracy Landis apartment." However, with regard to the suppression of statements, the court's oral disposition allowed the State "to use those statements made by Mr. Herrmann that indicate that, one, this was his apartment

## ANALYSIS

¶ 9. In reviewing an order granting or denying a motion to suppress evidence, a circuit court's findings will be upheld unless clearly erroneous. *See* WIS. STAT. § 805.17(2); *State v. Secrist*, 224 Wis. 2d 201, ¶ 11, 589 N.W.2d 387 (1999). However, we will independently examine the circumstances of the case to determine whether the constitutional requirements of reasonableness have been satisfied. *See State v. Callaway*, 106 Wis. 2d 503, 511, 317 N.W.2d 428 (1982). "[I]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *State v. Phillips*, 218 Wis. 2d 180, ¶ 22, 577 N.W.2d 794 (1998).

¶ 10. Herrmann argues that the circuit court erred by failing to suppress the nine marijuana plants discovered in the "storage room" of his apartment. He contends that suppression is required under the Fourth Amendment because: (1) the officers had neither a valid search warrant for Herrmann's apartment nor a valid exception to the warrant requirement; and (2) the officers failed to stop all search-related activity when they discovered they were in the wrong apartment.

¶ 11. The facts of this case are similar to those of *Maryland v. Garrison*, 480 U.S. 79 (1987). In *Garrison*, Baltimore police officers obtained a warrant to search premises "known as 2036 Park Avenue third floor

---

that they were in, and, two, they were not in Miss Landis's apartment or apartment six anymore." Because this distinction is immaterial and because neither party disputes that "all statements" were suppressed, the discrepancy is not at issue before this court.

apartment." *Id.* at 80. When applying for and executing the warrant, the officers believed that there was only one apartment located on the third floor; however, the third floor was, in fact, divided into two apartments—one occupied by McWebb and the other by Garrison. As here, "before the officers executing the warrant became aware that they were in a separate apartment occupied by [Garrison], they had discovered [incriminating evidence]." *Id.*

¶ 12. The *Garrison* Court addressed first whether the warrant was valid given its broad description of the premises to be searched, a description based on the mistaken belief that there was only one apartment on the third floor of the building to be searched. *See id.* at 84–85. The Court held that "if the officers had known, or even if they should have known, that there were two separate dwelling units on the third floor of 2036 Park Avenue, they would have been obligated to exclude [Garrison's] apartment from the scope of the requested warrant." *Id.* at 85. The Court ultimately concluded that although the warrant turned out to be ambiguous in scope, it was valid when it was issued, based on the information the officers disclosed or had a duty to discover and disclose. *See id.* at 85–86.

¶ 13. In viewing the execution of the warrant in *Garrison*, the Court held that if the officers knew or should have known of the error in the warrant, "they would have been obligated to limit their search to McWebb's apartment." *Id.* The Court, however, stated: "While the purposes justifying a police search strictly limit the permissible extent of the search, the Court has also recognized the *need to allow some latitude for honest mistakes* that are made by officers in the dangerous and difficult process of making arrests and executing search warrants." *Id.* (emphasis added).

144

¶ 14. Here, there is no dispute that the officers were in the process of executing a valid search warrant on Landis's apartment when they entered Herrmann's apartment. The question therefore becomes whether the execution of the warrant on Landis's apartment violated Herrmann's constitutional right to be secure in his home. *See id.* at 86. Herrmann argues that the officers here either knew or should have known that there were two apartments on the second floor and should have limited their search accordingly. We disagree. First, Herrmann contends that the doorway leading to his apartment was clearly marked with a number "5." However, as the State points out, the officers did not enter through Herrmann's exterior door. Further, both Cragin and Frawley testified that the door to Landis's apartment was at the top of the stairway and that the area to the right, where Herrmann's exterior door was located, was dark and "filled full of junk." Neither recalled seeing the number "5" above the doorway and Cragin, in fact, did not recall seeing Herrmann's door at all.

¶ 15. Herrmann additionally argues that in addition to the chain lock, the common door between the two apartments was secured with wood screws. There was, however, conflicting testimony on this issue as the officers testified that the door was secured only by the chain lock and neither Cragin nor Frawley saw or removed any wood screws from the door. The circuit court found no evidence that the screws were in the door at the time the officers went through it. This finding will not be disturbed, as we recognize that "[i]t is the function of the trier of fact, and not of an appellate court, to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences

from basic facts to ultimate facts." *State v. Poellinger,* 153 Wis. 2d 493, 506, 451 N.W.2d 752 (1990).

¶ 16. Herrmann further claims that Cragin had received a written diagram of instructions regarding the location of Landis's apartment in relation to Herrmann's apartment. Cragin testified that he never received such a diagram nor was he told that there were two apartments on the second floor. Herrmann nevertheless suggests that the officers had a duty to determine the limits of Landis's apartment. A similar argument was made by Garrison, who proposed "that the police conduct a preliminary survey of the premises whenever they search a building in which there are multiple dwelling units, in order to determine the extent of the premises to be searched." *Garrison,* 480 U.S. at 89 n.14. The *Garrison* Court, however, found "no persuasive reason to impose such a burden over and above the bedrock requirement that, with the exceptions we have traced in our cases, the police may conduct searches only pursuant to a reasonably detailed warrant." *Id.*

■

¶ 17. While executing a valid search warrant on Landis's apartment, officers discovered approximately five pounds of marijuana in a closet. To the right of this closet, the officers encountered another door, closed only with a chain lock. As Cragin testified, they "naturally [opened] up the next closet door," in which they observed what they believed was a storage room for Landis's apartment. At the time the officers entered Herrmann's apartment and discovered the nine marijuana plants in the "storage room's" closet, the officers believed they were still in Landis's apartment. This court has recognized that:

A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found. . . . When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home, . . . must give way to the interest in the prompt and efficient completion of the task at hand.

*State v. Fischer*, 147 Wis. 2d 694, 698, 433 N.W.2d 647 (Ct. App. 1988) (quoting *United States v. Ross*, 456 U.S. 798, 820–21 (1982)). We conclude that it was reasonable for the officers, in the continued execution of the warrant on Landis's apartment, to unchain and enter the door into what they mistakenly, but reasonably, believed was another room in Landis's apartment. As in *Garrison*, "the officers' conduct was consistent with a reasonable effort to ascertain and identify the place intended to be searched within the meaning of the Fourth Amendment." *Garrison*, 480 U.S. at 88–89. Accordingly, we agree with the circuit court's determination that the nine marijuana plants discovered in the storage room's closet are admissible and affirm that part of the court's order.

¶ 18. The State argues that the circuit court nevertheless erred by suppressing all of the remaining statements and evidence. In *Garrison*, the Court recognized that the officers "were required to discontinue the search of [Garrison's] apartment as soon as they discovered that there were two separate units . . . ." *Id.*

at 87. Here, the officers did not discontinue the search, but rather, elicited incriminating statements and evidence from Herrmann before obtaining a search warrant for his premises. The State nevertheless asserts that Herrmann consented to the limited search of his apartment. We disagree.

¶ 19. Although consent is a valid exception to a warrantless search, *see State v. Douglas*, 123 Wis. 2d 13, 18, 365 N.W.2d 580 (1985), consent must be freely and voluntarily given. *See State v. Bermudez*, 221 Wis. 2d 338, 348, 585 N.W.2d 628 (Ct. App. 1998). In *Bermudez*, this court recognized:

> [T]he proper test for voluntariness of consent under the fourth amendment is whether under the totality of the circumstances it was coerced. If consent is granted only in acquiescence to an unlawful assertion of authority, the consent is invalid.

*Id.* (citation omitted). Further, even if consent is deemed voluntarily given, we must determine whether the evidence was obtained by an exploitation of the prior illegal entry. *See id.* at 352. "The State has the burden to show 'a sufficient break in the causal chain between the illegality and the seizure of evidence.' " *Id.* When applying this attenuation theory, we must consider: "(1) the temporal proximity of the misconduct and the subsequent consent to search, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct." *Id.* at 353.

¶ 20. The circuit court found that Herrmann was sleeping in his own home—it was the middle of the night—and he awoke to find officers with flashlights standing in his kitchen, yelling "search warrant."

Under these coercive circumstances, we conclude that any consent Herrmann may have given was neither voluntary nor sufficiently attenuated from the warrantless entry. In any event, *Garrison* requires that all searching cease once the officers are aware that they are no longer operating under a valid search warrant. *See Garrison*, 480 U.S. at 86–87. We therefore affirm that part of the circuit court's order suppressing Herrmann's incriminating statements and evidence seized from under the living room couch.

¶ 21. The State further argues that the trial court erred by suppressing all evidence obtained as a result of the subsequent search warrant issued on Herrmann's apartment. We agree. The United States Supreme Court has held that where there is sufficient untainted evidence presented in the warrant affidavit to establish probable cause, the warrant is valid. *See United States v. Karo*, 468 U.S. 705, 719 (1984). Similarly, in *State v. O'Brien*, 70 Wis. 2d 414, 234 N.W.2d 362 1975), where a search warrant was issued based on both tainted and untainted evidence, our supreme court held that it could independently "determine that the [untainted evidence was] sufficient to support a finding of probable cause to issue the search warrant for a search of the entire [premises]." *Id.* at 424.

¶ 22. The test for the issuance of a search warrant is whether, considering the totality of the circumstances set forth in support of the warrant, probable cause exists to believe that objects linked to the commission of a crime are likely to be found in the place designated in the warrant. *See State v. Ehnert*, 160 Wis. 2d 464, 470, 466 N.W.2d 237 (Ct. App. 1991). Probable cause for a search warrant is not a technical or legalistic concept, but rather, is a "flexible, common-

sense measure of the plausibility of particular conclusions about human behavior." *State v. Kerr,* 181 Wis. 2d 372, 379, 511 N.W.2d 586 (1994). It is the issuing judge's duty to make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *State v. Higginbotham,* 162 Wis. 2d 978, 990, 471 N.W.2d 24 (1991).

¶ 23. Here, the search warrant issued, in part, based upon the officers' discovery of the nine marijuana plants in the "storage room" adjacent to Landis's apartment. Because an issuing magistrate could find it fairly probable that the discovery of the nine marijuana plants would lead to the discovery of other contraband within Herrmann's apartment, we conclude that the discovery of these plants alone would have been sufficient to support a search warrant of Herrmann's apartment. Accordingly, we reverse that part of the circuit court's order suppressing all evidence obtained as a result of the warrant under which Herrmann's apartment was later searched.

*By the Court.*—Order affirmed in part; reversed in part and cause remanded.

¶ 24. HOOVER, P.J. *(concurring in part; dissenting in part).* I concur with that part of the majority opinion affirming the circuit court's order suppressing Herrmann's statements and the evidence seized from beneath the couch. I respectfully dissent, however, regarding the balance of the majority's analysis. In my opinion, encountering the door that was locked from the inside with a chain lock gave the officers reason to

believe that they would exceed the scope of their lawful search by going beyond that door.

¶ 25. The officers searched a "catacomb" of "many rooms" in Landis's apartment. They eventually found marijuana in the sewing room closet. The officers noticed a door that was approximately one foot from the closet containing the marijuana. They believed it to be a closet door. It was closed and secured with a chain lock.[1] "Naturally," they unfastened the chain and opened the door, whereupon they discovered not a closet, but another room.

¶ 26. In *Garrison*, the Supreme Court observed that if the officers had known, *or should have known,* that the third floor contained two apartments before they entered the living quarters of the third floor, they would have been obligated to limit the scope of the search. *See Maryland v. Garrison,* 480 U.S. 79, 86–87 (1987). Later, the Court held that "the validity of the search of respondent's apartment pursuant to a warrant authorizing the search of the entire third floor depends on whether the officers' failure to realize the overbreadth of the warrant was objectively understandable and reasonable." *Id.* at 88. Thus, *Garrison* provides that the scope of an officer's search is subject to both a subjective and objective test.

¶ 27. The circuit court found that the officers believed that the door secured with the chain lock led to another area of Landis's apartment. This finding of subjective belief is based upon the court's credibility assessment and will therefore not be disturbed on appeal. The circuit court also found, without explica-

---

[1] A photograph admitted at the hearing shows that the chain lock was located approximately six inches above doorknob level.

tion, that the officers' belief was reasonable.[2] The majority embraces this finding, explaining that the officers' conduct constituted a reasonable effort to ascertain the place to be searched. The conduct referred to was their unlatching a device commonly used and understood to provide security against the world on the other side of the door to which it was attached.

¶ 28. The question of reasonableness in a search and seizure setting is an issue of constitutional fact, making our review de novo. *See State v. Turner*, 136 Wis. 2d 333, 344, 401 N.W.2d 827 (1987). In my view, when the officers encountered a door that was locked to safeguard the apartment against outside intrusion, they had reason to know that it was at least likely to be the apartment's terminus. It was not, again in my opinion, objectively reasonable for them to assume that they were facing a closet door, locked to prevent an exit from within. To the extent it was reasonable, however, the reasonableness was compromised when they were confronted not with what they expected, a closet, but a separate room. At this point, the combination of the chain-locked door and the therefore questionable assumption proven unjustified would alert reasonable officers that searching beyond the door might well take them beyond the scope of their search warrant.

---

[2] Similarly, the State does not attempt to explain the reasonableness of the officers' assumption that the chain-latched door led to more of Landis's apartment. Instead, it asserts that the officers had *no* reason to know that they were entering another apartment. In referring to the door, the State observes that is was "fastened *only* with a chain lock" and was "unmarked." (Emphasis added.) It characterizes the officers' entry into Herrmann's apartment as "inadvertent."

¶ 29. I would hold that when the officers had, objectively, reason to know that proceeding past the locked door might take them beyond the scope of their search, they should have ended their search until they undertook reasonable steps to ascertain the limits of Landis's apartment. For example, with the privacy of a citizen's home at issue, it would not unreasonably burden the officers to go back to the stairway that led them to Landis's residence in an attempt to ascertain if there were neighboring apartments. They could have contacted Landis to inquire as to whether she had a neighbor.[3] They could have similarly inquired of the landlord or of other tenants in this multi-unit building.

¶ 30. Under *Garrison*, because the officers had reason to know that proceeding beyond the latched door would exceed the scope of the search warrant, their conduct in doing so violated Herrmann's right to be free from unreasonable searches and seizures. I would therefore reverse the circuit court's order denying the motion to suppress the nine marijuana plants. Suppression of this evidence "taints" the basis for the second search warrant that the majority relies upon. Under my analysis, the officers never would have entered Herrmann's residence and would therefore not have been in a position to make any observations upon which a warrant could be issued. I would accordingly affirm the circuit court's order suppressing all evidence obtained during the second search.

[3] Landis was in jail at the time the warrant was executed. There is some indication in the record that she may not have cooperated with the authorities. That possibility, however, would not excuse an attempt to contact her.