STATE of Wisconsin, Plaintiff-Respondent,

v.

David L. MUNROE, Defendant-Appellant.

Court of Appeals

No. 00–0260–CR. Submitted on briefs February 6, 2001.—Decided March 20, 2001.

## 2001 WI App 104

(Also reported in 630 N.W.2d 223.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Peter M. Koneazny*, assistant state public defender of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Paul Lundsten*, assistant attorney general, and *James E. Doyle*, attorney general.

Before Fine, Schudson and Curley, JJ.

¶ 1. FINE, J. David L. Munroe appeals from a judgment of conviction entered on his guilty plea to possessing fewer than five hundred grams of tetrahydrocannabinol. *See* WIS. STAT. § 961.41(1m)(h)1.

5

He claims that the trial court erred in not granting his motion to suppress.[1] We reverse.

## I.

¶ 2. At 7 a.m. on a Monday morning, two police officers employed by the City of Glendale knocked on the door of the motel room rented and occupied by Munroe. They were in uniform and they were armed. They were doing "hotel intradiction," which one of the officers testified involved checking hotels in the city for "anything illegal"—primarily drugs, but also guns and prostitution.

¶ 3. Shortly before knocking on Munroe's door, the officers checked the motel's register of guests and ascertained that Munroe had paid cash for his room and did not show a photo identification when he registered. A Glendale ordinance provided that every hotel in the city:

> shall require identification of any guest, roomer or lodger paying in cash, at the time of registration, and in a valid and current format showing the person's name and date of birth, and may be, but is not limited to, a driver's license, state issued picture identification card, or such other form as will reasonably assure that the registrant is, in fact, the person under whose name such lodging, room or accommodation is, in fact, being procured.

GLENDALE, WIS. CODE OF ORDINANCES, § 11–2–14(1)(a) (1994). The ordinance also made it illegal for any person to "procure . . . lodging in any . . . motel or hotel . . . through misrepresentation or production of false iden-

---

[1] A defendant may appeal from an order denying a motion to suppress evidence even though the judgment of conviction rests on a guilty plea. WIS. STAT. § 971.31(10).

tification, or identification which misrepresents the identity of the person procuring . . . such lodging." § 11–2–14(e). As we have seen, the ordinance only requires that those paying cash present a sufficient identification that "will reasonably assure that the registrant is, in fact, the person under whose name such lodging, room or accommodation is, in fact, being procured." It does not require those paying cash to show a photo identification.

¶ 4. When one of the officers knocked on Munroe's motel-room door, Munroe answered. According to the officer's testimony at the suppression hearing, the officer asked Munroe if the officers could "come in and talk to him," and Munroe responded "yeah." The officer testified that Munroe then stepped back and "allowed me to enter the room." Although Munroe disputed this, the trial court believed the officer's testimony, and Munroe does not challenge this ruling on appeal.

¶ 5. Upon the officers' entry, they told Munroe, who was about to light up a cigarette, not to smoke and to sit on the bed. They did not then see anything "unusual" in the room. The officer who testified at the suppression hearing told the trial court:

> I asked— I explained to Mr. Munroe that I was there to confirm his identification, explained that he needs to show photo ID when paying cash for a hotel room. He stated he didn't have a photo ID. He showed me a social security card and verbally identified himself. I asked him if I could search his room for anything illegal.

Munroe replied, according to the officer's testimony, that he would "rather not." The officer then continued to question Munroe, and explained the officers' concern that the motel was a haven for illegal activity, and

7

again asked if they could search the room. This time, according to the officer, Munroe said "okay, go ahead." The officers searched the entire room and found the marijuana in Munroe's backpack.

¶ 6. The officer testified that the "only reason" they went to Munroe's room was to check his identification, and that they had no information to connect him to any drug dealing. Munroe testified that although he agreed to the search when asked the second time, he said he did so because the officers indicated that if he did not agree they would bring over a drug-sniffing dog. The officer who testified at the suppression hearing denied this. The trial court indicated that it believed the officer but that it also believed that it was not important whether the officers threatened to bring over a drug-sniffing dog or not. The trial court denied Munroe's motion to suppress the marijuana.[2]

## II.

¶ 7. The lawfulness of searches and seizures of property is governed by the Fourth Amendment to the United States Constitution and Article I, section 11 of the Wisconsin Constitution, which have been construed congruently. *State v. Phillips*, 218 Wis. 2d 180, 195, 577 N.W.2d 794, 801 (1998).[3] The protection

---

[2] The concurrence complains that our summary of the material evidence is an "all-too-sparse summary," but does not indicate what in the record it believes should have been mentioned but was not.

[3] The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon proba-

8

afforded by these provisions extends to hotels and motels as well as to homes. *United States v. Jeffers*, 342 U.S. 48 (1951); *State v. Bermudez*, 221 Wis. 2d 338, 585 N.W.2d 628 (Ct. App. 1998). On our review, we give substantial deference to the trial court's findings of fact. WIS. STAT. RULE 805.17(2) (trial court's findings of fact will not be set aside on appeal unless they are "clearly erroneous"). Nevertheless, the legality of a search by law-enforcement personnel, including whether a person's "consent" for a warrantless search is voluntary, are matters that we review *de novo*. *Phillips*, 218 Wis. 2d at 191–195, 577 N.W.2d at 799–801.

¶ 8. Generally, a search for evidence is not valid unless law enforcement officers have a lawfully issued warrant. *See* U.S. CONST. amend. IV; WIS. CONST. art. I, § 11. One of the exceptions to the requirement that law-enforcement officers get a search warrant is consent to the search by someone able to give consent. *State v. Herrmann*, 2000 WI App 38, ¶ 19, 233 Wis. 2d 135, 148, 608 N.W.2d 406, 412. Long ago, however, the United State Supreme Court recognized that the non-objected-to warrantless entry by law enforcement officers into "living quarters" is entry "demanded under color of office" and is thus "granted in submission to authority rather than as an understanding and intentional

ble cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article I, section 11 of the Wisconsin Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

9

waiver of a constitutional right." *Johnson v. United States*, 333 U.S. 10, 13 (1948). In *Johnson,* officers smelled opium coming from a hotel room. *Id.*, 333 U.S. at 12. They went to the room, knocked on the door, and announced themselves. *Ibid.* After a bit of a delay, a woman opened the door. *Ibid.* The lead officer told the woman that he wanted to talk to her " 'a little bit.' " *Ibid.* According to the officer, the woman then " 'stepped back acquiescently and admitted us.' " *Ibid.* The acquiescence in *Johnson* is similar to Munroe's acquiescence here; he let the officers into his room because they told him, in the words of the officer who testified, that they wanted to "confirm his identification."

¶ 9. The issue of whether Munroe's acquiescence to the officers' search made that search lawful requires a review of the principles material to when and under what circumstances law-enforcement officers may search for and seize evidence. As seen, there is a general requirement that law-enforcement officers have a warrant to search and seize. Both the Fourth Amendment and Article I, § 11, require that search warrants not only "particularly" describe the place to be searched, but also the "things to be seized." This requirement for particularity was a reaction by the Framers against the hated General Warrants and Writs of Assistance, which were used by the King's officers to search and seize at will. *See Payton v. New York*, 445 U.S. 573, 583–584 & n.21 (1980). Simply put, the Framers wanted to prohibit "general searches" by government agents. *Maryland v. Garrison,* 480 U.S. 79, 84 (1987) (describing this as the "manifest purpose" of the "particularity requirement"). Thus, where the search exceeds the warrant's description of either the

place to be searched or the items to be seized, the evidence must be excluded. *See id.*, 480 U.S. at 84–85 (" 'Just as probable cause to believe that a stolen lawnmower may be found in a garage will not support a warrant to search an upstairs bedroom, probable cause to believe that undocumented aliens are being transported in a van will not justify a warrantless search of a suitcase.' ") (quoted source omitted). Accordingly, once officers recognize (or reasonably should recognize) that they are exceeding the scope of the warrant, they must stop. *Id.*, 480 U.S. at 87–89; *State v. Herrmann*, 2000 WI App 38, ¶¶ 18, 20, 233 Wis. 2d 135, 147–149, 608 N.W.2d 406, 411–412. As noted, there was no warrant here, but similar principles apply because, as we have noted, the core value underlying the Fourth Amendment is that law-enforcement officers not be permitted to conduct wide-ranging, general searches.

¶ 10. Consent to a search "must be freely and voluntarily given." *Herrmann*, 2000 WI App at ¶ 19, 233 Wis. 2d at 148, 608 N.W.2d at 412. "If consent is granted only in acquiescence to an unlawful assertion of authority, the consent is invalid." *Bermudez*, 221 Wis. 2d at 348, 585 N.W.2d at 633. Moreover, an initial refusal to permit a search when asked "also militates against a finding of voluntariness." *State v. Kiekhefer*, 212 Wis. 2d 460, 472, 569 N.W.2d 316, 324 (Ct. App. 1997).

¶ 11. The officers entered Munroe's room for, ostensibly, one purpose: to check his identification. This stated purpose was not true (the officer admitted that they were on a drug, gun, and prostitution interdiction; certainly two armed officers were not dispatched to see who was either paying cash without

11

showing a photo identification or registering under an alias), but it *was* the reason Munroe acquiesced to their entry and cooperated with them. They checked his identification and determined that he did not violate the Glendale ordinance that prohibits someone from registering in a motel under an assumed name. Once the officers were assured that Munroe had not violated the ordinance—again, this was the proffered but false reason for their having knocked on his door at 7 a.m.—their "license" granted by Munroe's acquiescence to their presence in his room vanished, because the lawfulness of an officer's actions turns on the officer's role or function at the time. *State v. Dull*, 211 Wis. 2d 652, 659, 663, 565 N.W.2d 575, 578–579, 580 (Ct. App. 1997) (officer's shift from community-caretaker function to that of law-enforcement). Thus, they had no authority to use their continued presence in his room to conduct a general search, and Munroe denied their first request to do so. Their continued questioning and their renewed request to search made Munroe's "consent" not voluntary. *See Bermudez*, 221 Wis. 2d at 348, 585 N.W.2d at 633 (consent granted only in acquiescence to unlawful assertion of authority is invalid).

¶ 12. Although not directly applicable here because the officers' requests to search *were themselves unlawful assertions of authority*, our cases recognize that consent to search can follow *earlier* illegal police activity; if that happens, the consent is invalid unless the effect of the earlier illegal police activity has been attenuated. *Id.*, 221 Wis. 2d at 352, 585 N.W.2d at 634. There are three factors that apply in an analysis of whether the earlier illegal police activity has sufficiently attenuated by the time consent to search is given, and analysis of them in light of the circum-

stances of this case underscores why the officers' search pursuant to Munroe's "consent" was unlawful.

¶ 13. The three factors that help to determine whether the taint of earlier illegal police activity has been attenuated by the time a consent to search is granted are: "(1) the temporal proximity of the official misconduct and seizure of evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *Phillips*, 218 Wis. 2d at 205, 577 N.W.2d at 805. Applying them here, we see that, first, the officers' search of Munroe's room was contemporaneous with their unlawful continued presence in his room. There was thus "temporal proximity." Second, unlike the situation in *Phillips,* where the officers honestly "explained that [suspected drug dealing was] the purpose of the visit," and thus provided *Phillips* "with sufficient information with which he could decide whether to freely consent to the search of his bedroom," 218 Wis. 2d at 208–209, 577 N.W.2d at 807, the officers here continued to mislead Munroe about their real reason for being in his room right up to the time that he finally agreed to let them search. Third, persons in our society have a right founded in deep and abiding constitutional principles "to dwell in reasonable security and freedom from surveillance." *Johnson,* 333 U.S. at 14. Justice Robert H. Jackson, writing for the Court, expressed it so well:

> An officer gaining access to private living quarters under color of his office and of the law which he personifies must then have some valid basis in law for the intrusion. Any other rule would undermine 'the right of the people to be secure in their persons, houses, papers and effects,' and would obliterate one of the most fundamental distinctions between

13

our form of government, where officers are under the law, and the police-state where they are the law.

*Id.*, 333 U.S. at 17 (footnote omitted). Sadly, the officers here used their ruse about wanting to check Munroe's identification to mimic those myrmidons of King George who bedeviled the colonists with their General Warrants and Writs of Assistance, which gave the king's agents license to search everywhere and everyone. Unlike the situation in *Phillips*, 218 Wis. 2d at 185, 577 N.W.2d at 797, the officers here were not investigating information that the object of their search was involved in any illegal activity; they were doing a general sweep.[4] Their violation of Munroe's constitutional rights was purposeful and flagrant.

---

[4] As noted in *Schneckloth v. Bustamonte*, 412 U.S. 218, 231–232 (1973):

> Consent searches are part of the standard investigatory techniques of law enforcement agencies. They normally occur on the highway, or in a person's home or office, and under informal and unstructured conditions. The circumstances that prompt the initial request to search may develop quickly or be a logical extension of investigative police questioning. The police may seek to investigate further suspicious circumstances or to follow up leads developed in questioning persons at the scene of a crime.

Here, however, the "initial request" to search neither "develop[ed] quickly" nor was a "logical extension of investigative police questioning"—there were *no* "suspicious circumstances" or "leads." Indeed, the officer conceded during his testimony at the suppression hearing that he and his partner did not have any reason to suspect that Munroe was involved in *any* unlawful activity (other than, perhaps, registering at the motel under an assumed name, a "suspicion" that they quickly allayed). We emphatically reject the State's attempt to justify what was done in this case to Munroe because he selected an inexpensive motel where, according to the officer's testimony, *other persons* had engaged in illegal activity.

14

*By the Court.*—Judgment reversed.

¶ 14. SCHUDSON, J. *(concurring).* Although I agree with much of the majority opinion, I do not fully join in it for three reasons.

¶ 15. First, the majority opinion offers an all-too-sparse summary of the factual record, additional portions of which are essential to a complete understanding of the case.

¶ 16. Second, while the majority opinion acknowledges that this case involves a *warrantless* search, it draws much of its legal sustenance from the well of *search warrant* authority. Without citation to

<hr>

This is the argument that the State attempts to have us sanction:

> The suspicion in this case was more than a hunch, but less than probable cause. The officers went to the North Shore Inn in an attempt to detect illegal drug traffic because the motel had a problem with drugs, guns and prostitution. The fact that police are dealing with a high crime area is a proper consideration. Once at the motel, police determined that a person identifying himself as David Munroe had checked in, paid with cash and failed to produce a photo ID.
>
> Regardless of any particular municipal ordinance, no experienced law enforcement officer would have failed to find this information suspicious. This suspicion justified the minimal intrusion of a brief investigatory stop.

(Record references and case citation omitted.) The brief "investigatory stop" to which this portion of the State's brief refers is an attempt to support the trial court's conclusion that the officers were justified in talking to Munroe in his motel room about drugs under the authority for brief investigatory stops set out in *Terry v. Ohio*, 392 U.S. 1 (1968) and WIS. STAT. § 968.24. But both *Terry* and § 968.24 authorize such stops in public places, not in homes or hotel rooms. *Foley v. Connelie*, 435 U.S. 291, 297 (1978) *(Terry)*; § 968.24 (" . . . a law enforcement officer may stop a person in a public place . . . ").

authority, it then asserts, "[T]here was no warrant here, but similar principles apply. . . ." Majority at ¶ 9. Do similar principles apply? Perhaps, but the majority opinion has failed to explain why, in this case, it is necessary or appropriate to rely on what often stands as a significantly distinct body of law.

¶ 17. Third, the majority opinion relies on attenuation principles but, curiously, comments that these principles are "not directly applicable here. . . ." Majority at ¶ 12. If "not directly applicable here," however, they play little if any part in the analysis. But in my estimation, this portion of the majority opinion sells itself short; the attenuation analysis is "directly applicable here."

¶ 18. Accordingly, I respectfully concur.