COURT OF APPEALS
DECISION
DATED AND FILED

April 25, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1962-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2019CF206

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

MICHAEL S. ORMOSEN,

    DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Columbia County: W. ANDREW VOIGT, Judge. *Reversed and cause remanded with directions*.

Before Graham, Nashold, and Taylor, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Michael Ormosen appeals a judgment of conviction for operating a motor vehicle while under the influence of an intoxicant

(OWI) and an order denying his suppression motion. The sole issue on appeal is whether police lawfully entered Ormosen's home pursuant to his wife's consent. Because we conclude that the State has not met its burden of establishing that the consent was voluntary, we reverse and remand for proceedings consistent with this opinion.

## BACKGROUND

¶2    The State charged Ormosen with one count of OWI as a seventh, eighth, or ninth offense, and one count of operating with a prohibited alcohol concentration. Ormosen moved to suppress all evidence obtained following police officers' entry into his home, arguing that his wife's consent to the officers' entry was coerced and involuntary. At an evidentiary hearing, the circuit court heard testimony from Officer Spencer Oemig, Ormosen's wife, and Ormosen's mother-in-law.

¶3    Oemig testified as follows. Oemig responded in the early evening to a report of a collision between a motorcycle and a parked car on Main Street in Fall River, Wisconsin. Witnesses reported that a person later determined to be Ormosen had been drinking at a bar near the collision and was operating the motorcycle at the time of the crash. Witnesses also reported that, following the collision, Ormosen was thrown from the motorcycle, and that he got up and fled the scene on foot.

¶4    Oemig went to Ormosen's home to look for him. When Oemig arrived, he saw two women in the yard—Ormosen's wife, Paulette Ormosen,[1] and

---

[1] We refer to Paulette Ormosen by her first name to distinguish her from Michael Ormosen.

Paulette's mother, Alice Pichler. When Oemig asked if they had seen Ormosen, Paulette responded that she had not seen Ormosen since he left the house following an argument they had that morning. Oemig then asked if he could search the home for Ormosen. Paulette responded that she did not want him to search the house because her children were getting ready for school. Oemig could not recall if he immediately told Paulette and Pichler why he was there, although at some point they discussed that Ormosen had been in an accident and that Oemig was concerned about Ormosen's well-being. After Paulette first refused to allow Oemig entry into the home, Oemig separated Paulette from Pichler and informed Paulette that she needed to remain where she was in the front yard.

¶5     Once the two women were separated, Oemig spoke privately with Pichler. He asked Pichler if she had seen Ormosen that day, and Pichler responded that she had not. Pichler also told Oemig that she had not been inside the house but that she was willing to look there if Paulette would allow it. Paulette allowed Pichler to enter the house to look for Ormosen.

¶6     While Pichler was looking for Ormosen in the house, Oemig again questioned Paulette as to Ormosen's whereabouts, and Paulette responded that she did not know. Oemig told Paulette that he would arrest her for the crime of obstructing an officer if he became aware that Paulette was lying to him. Paulette became nervous and upset.

¶7     After Pichler came out of the house, a second officer arrived. Pichler and Paulette were again separated, this time farther away from one another. Oemig again requested permission to enter the home to search for Ormosen, and Paulette again refused. Oemig agreed that Paulette denied him consent to search at least twice, but he could not recall if she did so more than

3

twice. At various points during his conversation with Paulette, Oemig informed her that lying to police was considered obstructing, a criminal offense.

¶8 Following Paulette's last refusal, Oemig told Paulette "something to the effect of I'm going to wait here until [Ormosen] comes out because he will have to come out at some point. At that time I'm going to arrest [him], and I'm going to arrest you as well for obstructing."[2] Paulette allowed the officers to search the home. At some point prior to Paulette granting consent, Pichler was permitted to leave.

¶9 Once inside the Ormosens' home, the officers discovered that Ormosen was in the attic. Ormosen came downstairs and Oemig placed him in handcuffs and led him out the door. Ormosen was transported to the Fall River Police Department, where, following field sobriety tests, he was placed under arrest.

¶10 Oemig testified that if Paulette had not granted him permission to enter the residence, he "would have stayed here at the house for a while to see if anybody exited the home." Specifically, Oemig would have stayed "the remainder of [his] shift, a few extra hours maybe." At no point during the encounter did Oemig consider trying to obtain a warrant to search the home for Ormosen. Oemig believed his failure to obtain a warrant was due to his "inexperience," and he further testified that, if he had it do over again, he probably would have sought a warrant after Paulette denied him entry into the home the first time.

---

[2] Oemig also testified that he told Paulette that he "would wait by the residence and that eventually [Ormosen] would come out at which point they would both be placed under arrest."

4

¶11     Paulette's testimony was consistent with the officer's testimony in many respects, but she further testified as follows. At about 6:30 that night, when Ormosen had not come home for dinner, she and Pichler went out looking for him. A bartender told Paulette that Ormosen had hit the bartender's car and left, and the bartender asked Paulette if she knew where Ormosen was. Paulette and her mother went to the Ormosens' home and were sitting on the deck for about 15 minutes when Oemig showed up. Oemig asked Paulette if she knew where Ormosen was, and when Paulette said she did not, Oemig told her that if she knew where Ormosen was and was not telling Oemig, she could be placed under arrest. At some point during this exchange, he also asked for consent to look for Ormosen in the house and Paulette refused.

¶12     According to Paulette, Oemig asked her for consent to search the home "[a]t least four or five" times and told Paulette that she could be arrested for obstruction of justice "[e]very single time." Paulette denied consent because her children, who were then seven and twelve years old, were in the house. Although Paulette understood Oemig to be saying that if he found out she was lying she would be placed under arrest, Oemig's final threat of arrest was different than the prior times in that he said something to the effect of, "I'm just going to wait for him to come out and arrest both of you." It was because of this statement that she agreed to allow the officers into the house.

¶13     Paulette testified that it was a "stressful situation" and that after about a half an hour into her encounter with police, she began crying. She testified that the officers required her to stay outside in the yard with them and that they would not let her go into her home, except when Oemig directed her to get Ormosen's business phone and to come back immediately, which Paulette did. When asked why she finally agreed to allow the officers into the house, she

testified that, in addition to the threat of being arrested, "[the officers] basically said there was no way they were going to leave unless I let them in the house. This was already over an hour. My kids were upstairs looking out the window. I can't tell [the kids] anything while I'm outside my house." She testified that she was not free to leave but that she did not ask to go into her home or request that the officers leave her property.

¶14 Pichler's testimony did not significantly add to or vary from the other witnesses' testimony. Regarding her interactions with the officers, Pichler testified that she was separated from Paulette for questioning; that she agreed to look for Ormosen on the first floor of the house but did not go upstairs because her grandchildren would not want to go to bed if they saw her; and that she believed that prior to being permitted to leave she asked once or twice to leave but that the officers told her they had more questions.

¶15 The circuit court denied Ormosen's motion to suppress, concluding that there was actual consent and that the consent was voluntary. The court made the following pertinent findings of fact:

- When Oemig arrived at the residence, he informed Paulette and Pichler why he was there and asked if they were aware of Ormosen's location.

- After one or both women denied knowing where Ormosen was, Oemig requested permission to search the house for Ormosen. Paulette denied the request and Oemig advised her that she could be arrested for obstructing if there was evidence that she lied to law enforcement.

- Oemig informed Paulette and Pichler that he was concerned about Ormosen's well-being.

6

- Pichler was given permission to enter the house to conduct a limited search for Ormosen. Upon Pichler's return from inside the residence, another officer arrived and more discussion occurred.

- Paulette "was permitted or requested"[3] to enter the residence to retrieve Ormosen's cell phone. Law enforcement made attempts to contact Ormosen using the phone, including by asking Paulette to try calling him, which Paulette did.

- At some point, Oemig made a second request to enter the residence. Paulette denied the request and Oemig again told Paulette that she could be arrested for obstructing if she lied to law enforcement.

- During this timeframe, Pichler was permitted to leave.

- Oemig also told Paulette, in the circuit court's words, that Oemig "would remain in the vicinity of the residence … to await [Ormosen's] exit from the home and then he would arrest both."[4] "At this point, Paulette [gave] Oemig permission to enter the residence."

- The officers located Ormosen hiding in an attic.

- At no point during the encounter did Paulette ask to end the contact, tell the officers to leave the property, request permission to enter the house for any reason other than to retrieve Ormosen's cell phone, or make any other request that was denied by law enforcement.

---

[3] The uncontroverted evidence is that Oemig told Paulette to retrieve Ormosen's phone from inside the home.

[4] The circuit court's complete statement was that Oemig told Paulette he "would remain in the vicinity of the residence *in a squad car potentially across the street* to await [Ormosen's] exit from the home and then he would arrest both." (Emphasis added.) Although it is unclear what the court meant by "potentially," we note that there was no testimony (or any other evidence) at the suppression hearing that Oemig stated he would wait in a squad car across the street. Moreover, neither party relies on such a finding.

Oemig's testimony was ambiguous as to where he intended to wait for Ormosen. Ormosen construes Oemig's testimony to mean that Oemig would wait in the Ormosens' yard. The State construes Oemig's testimony to mean that he would wait "by the residence," but does not indicate whether that means in the yard by the house or next to the yard. Under either interpretation, our conclusion in this case is the same.

- The encounter between Oemig and Paulette lasted about an hour.

- Paulette was told "at least once" to remain where she was and was "separated from her mother a couple times," during which time law enforcement spoke to the two women individually.

- Prior to the officers' entry into the home, they were denied entry into the residence twice.

- There was no evidence that Paulette "had any perceptible difficulties that made her more susceptible to law enforcement tactics."

- Oemig told Paulette at least three times that she would be arrested if he discovered that she was lying to him.

- The officers did not tell Paulette that she could refuse consent to enter; however, it is "fairly obvious" that Paulette "was aware of that."

- Paulette's statement that she did not know where Ormosen was "may well [have been] true," given testimony that: (1) Paulette was not aware of Ormosen's presence until officers were already in her home; and (2) Paulette told Oemig immediately upon his arrival that she did not know where Ormosen was. However, Oemig was not "under any obligation to accept such a statement as true," in light of the following:

  o Paulette never asked law enforcement for permission to enter the house to look for him, despite knowing about Ormosen's crash and potential injuries;

  o Paulette told law enforcement that they could not enter the house because her children were getting ready for school even though it was a Sunday at approximately 7:00 p.m.; although "[i]t is absolutely possible that this could have been true …, it adds to what the [c]ourt views as suspicious at best explanations for the denial";

  o Paulette allowed Pichler to enter the residence but limited where Pichler could look; and

  o Pichler testified that the reason for this was because there was concern that the children might have trouble going to bed on time if they encountered their grandmother, which the court

8

said was "entirely possible" but was "somewhat questionable given the time of day."

¶16     Following the denial of his suppression motion, Ormosen pled guilty to the OWI charge and was sentenced.  He now appeals.[5]

## DISCUSSION

¶17     When reviewing a circuit court's denial of a motion to suppress evidence, we will uphold a circuit court's findings of fact unless they are clearly erroneous.  ***State v. Grady***, 2009 WI 47, ¶13, 317 Wis. 2d 344, 766 N.W.2d 729; ***State v. Phillips***, 2009 WI App 179, ¶6, 322 Wis. 2d 576, 778 N.W.2d 157. "Whether the facts satisfy constitutional principles is a question of law for this court to decide." ***Phillips***, 322 Wis. 2d 576, ¶6.

¶18     It is a "'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" ***Brigham City v. Stuart***, 547 U.S. 398, 403 (2006) (quoted source omitted).  In particular, the physical entry of the home has been described by the United States Supreme Court as "the chief evil against which the wording of the Fourth Amendment is directed." ***United States v. United States Dist. Ct.***, 407 U.S. 297,

---

[5] The appellant's briefs do not comply with WIS. STAT. RULE 809.19(8)(bm) (2021-22), which addresses the pagination of appellate briefs.  *See* RULE 809.19(8)(bm) (providing that, when paginating briefs, parties should use "Arabic numerals with sequential numbering starting at '1' on the cover").  This rule was amended in 2021, *see* S. CT. ORDER 20-07, 2021 WI 37, 397 Wis. 2d xiii (eff. July 1, 2021), because briefs are now electronically filed in PDF format and electronically stamped with page numbers when they are accepted for e-filing.  As our supreme court explained when it amended the rule, the pagination requirement ensures that the numbers on each page of the brief "will match … the page header applied by the eFiling system, avoiding the confusion of having two different page numbers" on every page of a brief.  S. CT. ORDER 20-07 cmt. at x1.

All references to the Wisconsin Statutes are to the 2021-22 version.

313 (1972); *see also* **State v. Richter**, 2000 WI 58, ¶28, 235 Wis. 2d 524, 612 N.W.2d 29 (same).  Wisconsin courts have "scrutinized with the greatest care claims by the state to the use of evidence seized in warrantless searches of one's home." **State v. Douglas**, 123 Wis. 2d 13, 21, 365 N.W.2d 580 (1985).

¶19    One well-established exception to the Fourth Amendment's warrant requirement is for searches conducted pursuant to consent by an individual having either actual or apparent authority over the place to be searched.  **State v. Wantland**, 2014 WI 58, ¶¶20, 23, 355 Wis. 2d 135, 848 N.W.2d 810.  To determine whether the consent exception is satisfied, we consider:  (1) whether consent was, in fact, given; and (2) whether the consent was voluntary.  **State v. Artic**, 2010 WI 83, ¶30, 327 Wis. 2d 392, 786 N.W.2d 430.  Here, there is no dispute that Paulette gave actual consent and that she had authority to do so.  The question is whether her consent was voluntary.

¶20    When evaluating the voluntariness of an individual's consent to a search, we consider "'the totality of all the surrounding circumstances.'"  **Id.**, ¶32 (quoted source omitted).  To qualify as voluntary, a person's consent must be "'an essentially free and unconstrained choice'" that is not "'the product of duress or coercion, express or implied.'"  **Id.** (quoted source omitted).

¶21    The following nonexclusive factors are relevant to the voluntariness inquiry:  (1) whether the police used deception, trickery, or misrepresentation to obtain consent; (2) whether the police used threats, physical intimidation, or punishment by the deprivation of something like food or sleep to obtain consent; (3) whether the conditions attending the request to search were congenial, nonthreatening, and cooperative, or the opposite; (4) how the person giving consent responded to the request to search; (5) the characteristics of the consenting

individual, such as age, intelligence, education, physical and emotional condition, and prior experience with the police; and (6) whether the police explained that consent could be refused. *Id.*, ¶33.

¶22 The State bears the burden of proving that consent was given freely and voluntarily, and must satisfy that burden by clear and convincing evidence. *Id.*, ¶32. Applying the above principles of law to the undisputed facts, we conclude that the State has not met its burden of establishing by clear and convincing evidence that Paulette's consent was voluntary.

¶23 Regarding the first factor, Ormosen does not argue, nor does the record show, that police used or attempted to use deception, trickery, or misrepresentation to persuade Paulette to consent to the search. As the circuit court found, Oemig explained the purpose of the search.

¶24 As to the second factor—whether police used threats, physical intimidation, or punishment to obtain consent—we agree with the circuit court's observation that this factor "is substantially more complicated." As found by the court, Oemig threatened to arrest Paulette on at least three occasions, primarily in response to her refusal to grant him consent to enter her home. Although the court determined that Paulette's statements that she did not know Ormosen's whereabouts may or may not have been true, Oemig made it clear to Paulette that if she denied consent to search and Ormosen came out of the home, Paulette would be arrested for obstruction. According to Oemig's own testimony, in response to Paulette's last denial of consent, Oemig said something to the effect of, "I'm going to wait here until [Ormosen] comes out" and "[a]t that time I'm going to arrest [him], and I'm going to arrest you as well for obstructing."

¶25    The State argues that "[t]o the extent that [Oemig's] statement about arresting [Paulette] could be considered a 'threat,' it was only a 'threat' to do what [the officer] would have had the lawful authority to do:  arrest Paulette for obstruction if he developed probable cause that she lied about knowing where Ormosen was."  In support, the State cites two cases from the federal courts of appeals and a Nebraska court of appeals case:  *See **Thompson v. Haley***, 255 F.3d 1293 (11th Cir. 2001); ***United States v. Finch***, 998 F.2d 349 (6th Cir. 1993); ***State v. Grimes***, 870 N.W.2d 162 (Neb. App. 2015).  However, these cases—which address voluntariness of confessions rather than consent to enter a home—do not hold, or even suggest, that a threat of arrest cannot be a factor in determining, under the totality of the circumstances, whether consent to a search was voluntary. The State has not provided, nor have we uncovered, any precedent establishing that such threats may not be considered in this analysis.

¶26    In addition to Oemig's repeated threats to arrest Paulette, he also threatened, in response to Paulette's denial of consent, that he would stay "here," referring to the Ormosens' property, or "by the residence" until Ormosen emerged from the house, at which point both Paulette and Ormosen would be arrested. According to Paulette's undisputed testimony, it was this statement that finally led her to provide consent.  As Paulette testified, "[The officers] basically said there was no way they were going to leave unless I let them in the house.  This was already over an hour.  My kids were upstairs looking out the window.  I can't tell [the kids] anything while I'm outside my house."  *See **State v. Phillips***, 218 Wis. 2d 180, 200, 577 N.W.2d 794 (1998) (consideration in examining second factor is whether police "prolong[ed] the encounter to wear down the [consenter's] resistance … before the [consenter] consented to the search").  Further, on at least one occasion, Oemig restrained Paulette, depriving her of freedom of movement

12

on her own property. *See id.* (in examining this factor, court considers whether person from whom consent is obtained is "physically subdue[d] or restrain[ed]").

¶27 We next examine the third and fourth factors together, whether the conditions attending the request to search were congenial, nonthreatening, and cooperative—or the opposite—and how Paulette responded to law enforcement's request to search her home. As stated, before granting consent, Paulette refused Oemig's request to enter her home on two occasions, explaining that her children were in the home. Our supreme court has stated that "[a]n initial refusal of a request to search will weigh against a finding of voluntariness." *Artic*, 327 Wis. 2d 392, ¶56 (citing *State v. Kiekhefer*, 212 Wis. 2d 460, 472, 569 N.W.2d 316 (Ct. App. 1997). Here, this factor weighs more heavily against voluntariness, given that there was more than one refusal prior to consent. *See also State v. Munroe*, 2001 WI App 104, ¶11, 244 Wis. 2d 1, 630 N.W.2d 223 ("[The officers'] continued questioning and their renewed request to search made Munroe's 'consent' not voluntary.").

¶28 The evidence also shows that Paulette's encounter with the officers was far from congenial, nonthreatening, and cooperative. As noted, police repeatedly requested to enter Paulette's home and, upon her refusal, threatened to arrest her and to remain either on or by her property until Ormosen exited the house. The encounter took place over the course of approximately an hour, during which Oemig ordered Paulette to various locations in her own yard and further ordered her to remain there, restraining her movement until otherwise directed. Oemig also directed Paulette to enter her home to retrieve Ormosen's phone and provide it to law enforcement. In addition, law enforcement twice separated Paulette from her mother and ordered her mother to particular locations in Paulette's yard. It is undisputed that Paulette's young children were in the house

13

and that Paulette was upset and crying. *See **Phillips***, 218 Wis. 2d 180, 200-01 (in analyzing third factor, a consideration is whether person giving consent "was in any way overcome by the [officer's] tactics").

¶29     As to the fifth factor, the record contains no information regarding Paulette's age or education, and her testimony reveals no reason to doubt her intelligence.     However, her "emotional condition" undisputedly was one of distress and vulnerability, and there is no indication that she had any prior "experience with the police" that might have made her more resistant to the pressure of the police conduct here.

¶30     Regarding the sixth factor, the evidence shows that police did not inform Paulette of her right to refuse consent. Although we agree with the circuit court and the State that Paulette's initial refusals indicate that she was at least initially aware that she had the right to refuse, we conclude that Oemig's continued requests for consent and threats of arrest in response to Paulette's refusals weigh against a determination of voluntariness. This is especially so in light of Oemig's repeated assertions that he would arrest Paulette, which immediately followed her repeated exercise of the right to refuse consent.

¶31     Based on the totality of the circumstances—and bearing in mind that the physical entry of the home is the "chief evil" against which the Fourth Amendment is directed and that it is the State that has the burden of establishing voluntary consent—we conclude that the State has not met its burden of establishing by clear and convincing evidence that Paulette voluntarily consented to the officers' entry into the Ormosens' home.

¶32     Accordingly, we conclude that the circuit court erred in denying Ormosen's suppression motion. We therefore reverse that decision and remand

14

with directions to vacate the judgment of conviction and suppress the evidence obtained as a result of the unconstitutional search of the Ormosens' home.

*By the Court.*—Judgment reversed and cause remanded with directions.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.