STATE of Wisconsin, Plaintiff-Respondent,

v.

Luis E. BERMUDEZ, Defendant-Appellant.

Court of Appeals

*No. 97–0809–CR. Submitted on briefs June 16, 1998.—Decided August 5, 1998.*

(Also reported in 585 N.W.2d 628.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Donald T. Lang*, assistant state public defender, of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Mary E. Burke*, assistant attorney general.

Before Snyder, P.J., Brown and Anderson, JJ.

SNYDER, P.J. Luis E. Bermudez appeals from a judgment of conviction after entering a guilty plea to one count of possession with intent to deliver cocaine contrary to § 161.41(1)(cm)3, STATS., 1993–94.[1] On appeal, Bermudez renews his argument that the evi-

---

[1] The criminal complaint charged Bermudez with the following: one count of possession with intent to deliver cocaine as a repeat offender, *see* §§ 161.16(2)(b)1, 161.41(1)(cm)3 and 161.48(1), STATS., 1993–94; one count of possessing a controlled substance without a valid prescription, *see* §§ 161.16(2)(b)1 and 161.41(3m); possession of drug paraphernalia, *see* § 161.573(1), STATS., 1993–94 (Chapter 161 has been renumbered. *See* 1995 Wis. Act § 448.); and one count of possession of a controlled substance without tax stamps, *see* § 139.95(2), STATS. After entering a plea agreement to the amended charge outlined above, the remaining charges were dismissed.

341

dence seized as a result of the warrantless entry into his motel room should be suppressed as the "fruit of an unlawful entry." We agree and therefore reverse the judgment of conviction.

## STATEMENT OF FACTS

Bermudez and his wife Lisa, their four children, a babysitter and two other relatives were staying in a motel suite rented by a friend, Dalan Smith. Based on a report of considerable traffic to and from the room, as well as the number of local telephone calls originating from the room, it was placed under police surveillance for suspected drug activity.[2] At one point in the evening, Bermudez and Smith left the motel in a vehicle to go to a grocery store. Bermudez was stopped for a traffic violation and placed under arrest for operating after revocation/suspension. A search of the vehicle revealed some marijuana and a firearm.

Law enforcement officers decided to contact Lisa in order to tell her that her husband had been arrested. According to Donald M. Cavalary, a detective with the Waukesha County Sheriff's Department, he, Steven Toepfer, a police officer with the Brookfield police department, another officer from the Brookfield police department, and several metro drug unit officers proceeded to the room occupied by the Bermudez family. Cavalary testified that there were "maybe six officers as a rough estimate." Although Cavalary did not include Andrew Weber, the motel security guard, in this count, Weber testified that he was also part of this group.

---

[2] Andrew Weber, who was working part time as a plainclothes security officer at the motel, was also a deputy sheriff for Waukesha county.

There was conflicting testimony as to what happened next. Officers Cavalary and Toepfer testified that the door to the room was standing open. They stated that they requested permission to enter the room and that permission was granted by Lisa as she stood just inside the room. Guadalupe Rollan, the family's babysitter who was staying with the Bermudez family, testified that only moments before the police approached, she had left the motel room and closed the door behind her. She testified that she heard it shut. She then observed a group of men approach the closed door, open it and enter the room.

Weber, who was leading the group, admitted that he was carrying a motel passkey as he approached the room with the other officers but denied using it to open the door. He stated that the motel room door was open when the officers approached, that he identified himself as a security officer for the motel and that he indicated that the other men accompanying him were law enforcement officers. According to Weber, "one of the other law enforcement officers at the scene introduced himself and asked if [the officers] could come in." He testified that "[t]he response was a positive response because we were allowed to enter the room, which we did."

According to several officers who testified, three or four of them then entered the room. Toepfer testified that he received permission "three to five minutes" later to conduct a search. According to several of the testifying officers, Lisa expressed concern or embarrassment over the officers searching through some of her personal items in the bedroom. Cavalary testified that one of the officers responded with words to the effect that "for the safety of herself and [the] officers we would prefer that she not worry about that and those

343

personal items won't be disturbed." According to several officers who testified, Lisa then agreed to the search.[3]

Lisa's testimony differed significantly from that of the officers. She testified that when she came out of the bathroom, the officers had already entered. She stated that the door to the room was not standing open. She did agree that a uniformed officer first informed her that her husband had been arrested and then told her that "they found drug paraphernalia in the vehicle and that they wanted to search the room." She said that the officers

> came in and they asked me to walk towards them, and they asked me to not move. They were going to search the room. Two officers went into the room, started searching the room. The other two uniformed officers escorted me outside the door.

She also testified that the motel security guard "had a key in his hand." According to Lisa, approximately ten minutes into the search she told an officer that she did not want the room searched because she had "personal belongings that [were] very embarrassing." The search ultimately revealed cocaine and drug paraphernalia.

Bermudez brought a motion to suppress the evidence seized during the search of the motel room. He argued that because the officers entered the motel room without a warrant, the taint of the warrantless entry vitiated any claim that Lisa consented to the search and the evidence seized should be suppressed. The trial court declined to suppress the evidence. Although the court expressly found that the door was shut when the officers approached and that the initial

---

[3] At least one officer testified that this conversation occurred after the search had commenced.

entry was unlawful, it then found that Lisa consented to the search and concluded that this "somewhat . . . attenuated" the police officers' illegal entry. In the alternative, the trial court also suggested that the search could be upheld as a function of the officers' "community caretaker" role. Following the denial of the motion to suppress, Bermudez reached a plea agreement and pled guilty. Bermudez now appeals the denial of his suppression motion.

## STANDARD OF REVIEW

The issues before this court are threefold: (1) whether an illegal entry occurred; (2) whether Lisa voluntarily consented to the subsequent search of the motel room; and (3) if she did consent, whether that consent was sufficiently attenuated from any illegal conduct on the part of the officers.

"Voluntariness of consent is a question of constitutional fact, and we . . . review the circuit court's determination of this mixed issue of fact and law under the two-step analysis laid out in *Turner*." *State v. Phillips,* 218 Wis. 2d 180, 194–95, 577 N.W.2d 794, 801 (1998) (referencing *State v. Turner,* 136 Wis. 2d 333, 401 N.W.2d 827 (1987)). There are two facets to this determination and the appellate court applies a different standard of review to each. *See id.* at 189–94, 577 N.W.2d at 799–800. This two-step process is that a trial court's findings of evidentiary or historical facts "will not be upset on appeal unless they are contrary to the great weight and clear preponderance of the evidence." *Id.* at 190, 577 N.W.2d at 799 (quoted source omitted). However, when reviewing the trial court's determination of constitutional questions, "the appellate court independently determines the questions of 'constitutional' fact." *Id.* (quoted source omitted). We therefore

owe no deference to the trial court when making our determination of whether the constitutional standard of voluntariness had been met. *See State v. Xiong,* 178 Wis. 2d 525, 531, 504 N.W.2d 428, 430 (Ct. App. 1993). "[W]e are permitted to independently determine from the facts as found by the trial court whether any time-honored constitutional principles were offended in this case." *Phillips,* 218 Wis. 2d at 192, 577 N.W.2d at 800 (quoting *Turner,* 136 Wis. 2d at 344, 401 N.W.2d at 833).

## DISCUSSION

### *The Primary Illegality*

 Whether evidence should be suppressed because it was obtained pursuant to a Fourth Amendment violation is a question of constitutional fact. We accept the trial court's finding of fact that the initial entry into the motel room was without a warrant and was illegal. The trial court is the ultimate arbiter of the credibility of witnesses, *see State v. Angiolo,* 186 Wis. 2d 488, 495, 520 N.W.2d 923, 927 (Ct. App. 1994), and its credibility determinations will not be upset unless clearly erroneous, *see* § 805.17(2), STATS. The trial court found Rollan's testimony to be the most credible with regard to the position of the door at the time the officers approached it and that she observed the officers walk into the room without knocking. Rollan testified:

Q: Are you sure that door shut all the way?

A: I'm a hundred percent positive. Absolutely sure that [the] door was shut. There was nothing blocking its way.

. . . .

Q: What did you see after you saw the detective walk up to the room door?

A: Since their backs were towards me I seen their hands had reached towards the door knob. They had approached and they went into the room. As they were walking into the room Lisa just walked up in front of them.

. . . .

Q: Now, how did they gain entry into the room?

A: I did not exactly see if they had anything to open the door with because I had closed the door, but they did enter the room. I'm positive Lisa did not open the door for them.

Q: How are you positive of that?

A: Because I had a clear view of when they—they went in, were walking in and Lisa just walked up to them.

We accept the trial court's finding that the initial entry into the motel room was without consent.

### Consent to Search

Because the initial entry into the motel room was illegal, we must now determine whether Lisa subsequently consented to the search of the room. Even if she did, there remains an issue of whether that consent was voluntary and sufficiently attenuated from the illegal entry. If it is not, the discovery of the cocaine is the "forbidden fruit" of the unlawful entry. *Cf. State v. Walker,* 154 Wis. 2d 158, 185, 453 N.W.2d 127, 138 (1990) (determining whether a lineup and in-court identification of the defendant were the forbidden fruit of an unlawful arrest). The question in such a case is "whether, granting establishment of the primary ille-

gality, the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 186, 453 N.W.2d at 139 (quoting *Wong Sun v. United States,* 371 U.S. 471, 488 (1963)). The State has the burden to prove that the cocaine evidence is admissible once the defendant has established the "primary illegality." *Cf. id.* (citing *Brown v. Illinois,* 422 U.S. 590, 604 (1975)).

■

The taint of the initial illegal entry into the motel room may be removed if consent was given to conduct the search and that consent was freely and voluntarily given. The State has the burden of proving that the search was the result of "free, intelligent, unequivocal and specific consent without any duress or coercion, actual or implied." *State v. Johnson,* 177 Wis. 2d 224, 233, 501 N.W.2d 876, 879 (Ct. App. 1993) (quoted source omitted). "[T]he proper test for voluntariness of consent under the fourth amendment is whether under the totality of the circumstances it was coerced." *Id.* (quoted source omitted). If consent is granted only in acquiescence to an unlawful assertion of authority, the consent is invalid. *See Bumper v. North Carolina,* 391 U.S. 543, 548–49 (1968). We look to the totality of the circumstances, considering both the events surrounding the consent and the characteristics of the individual whose consent is sought. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973).

■

The trial court found that Lisa consented to the search of the motel room. While testimony about the sequence of events once the officers entered the room was inconsistent, the trial court's finding that Lisa gave consent to the search is not contrary to the great

weight and clear preponderance of the evidence.[4] *See Phillips,* 218 Wis. 2d at 196, 577 N.W.2d at 802. The testimony of the officers, coupled with the trial court's credibility determination, provide a sufficient basis on which to find that Lisa consented to the search of the motel room. *See id.* at 197, 577 N.W.2d at 802.

The remaining question is whether Lisa's consent was truly voluntary. While we look to the circumstances surrounding the consent and the characteristics of the defendant, no single criterion controls our decision. *See Schneckloth,* 412 U.S. at 226. In *Phillips,* the supreme court examined the following factors: whether any misrepresentation, deception or trickery was used to entice the defendant to give consent; whether the defendant was threatened or physically intimidated; the conditions at the time the request to search was made; the defendant's response to the agents' request; the defendant's general characteristics, including age, intelligence, education, physical and emotional condition, and prior experience with the police; and whether the agents informed the individual that consent to search could be withheld. *See Phillips,* 218 Wis. 2d at 198–203, 577 N.W.2d at 802–04.

As to the circumstances that existed immediately after the officers entered the motel room, we cannot say that *at that point in time* any deception or trickery was used to obtain Lisa's consent. The officers first informed her that her husband had been arrested and that drug paraphernalia had been found in the vehicle.

---

[4] Lisa denied giving permission for a search. However, both officers who testified and Weber, the security guard, stated that she gave permission for the search. The trial court is the arbiter of the credibility of witnesses. *See State v. Angiolo,* 186 Wis. 2d 488, 495, 520 N.W.2d 923, 927 (Ct. App. 1994).

Rollan, who observed the initial meeting, said that Lisa "seemed very surprised at first. Afterward she became calm as they began to speak, so then I realized there was actually no danger occurring inside the room." Thus, it appears that the officers disclosed to Lisa the reason they were interested in searching the motel room. *Cf. id.* at 198–99, 577 N.W.2d at 802–03. Lisa was informed that the officers wanted to search the room for drugs, based on the arrest of her husband. The officers did not mislead Lisa and claim to have a warrant, nor did they "mask their identities or misrepresent the purpose" in requesting permission to search. *Id.* at 199, 577 N.W.2d at 803.

There was no testimony whatsoever that Lisa was ever physically intimidated or threatened by the officers. They did not "deprive [Lisa] of any necessities, prolong the encounter to wear down [her] resistance, or employ any other coercive interrogation tactics before [she] consented to the search." *Id.* at 200, 577 N.W.2d at 803. In fact, at one point the officers permitted the children's babysitter, Rollan, to enter the room to collect food and clothing for the children. Compared to the facts presented by the *Phillips* case, the encounter in the motel room was very similar.

There is also evidence that the search was conducted under overall cooperative conditions. The eyewitnesses, including Lisa, testified that the police were responsive to her questions. Although Lisa expressed some embarrassment regarding the officers going through her personal things, she did not testify that she ever actually objected to the focus of the search itself, merely that she was embarrassed.[5]

---

[5] Lisa testified that the officers stated that they "needed to search the room" and that she never consented to the search. However, because the trial court concluded that Lisa had given

As in *Phillips,* the record provides little information concerning Lisa's characteristics. It is apparent from transcripts that she can speak and understand the English language. There is no evidence that she was under the influence of any drugs or alcohol, that she was uneducated or that she possessed below average intelligence. *See id.* at 202, 577 N.W.2d at 804. She was an adult, and there was no evidence that she was "particularly susceptible to improper influence, duress, intimidation, or trickery." *Id.* Although the officers did not inform her that she could withhold consent, this is not fatal to a determination of voluntariness. *See id.* at 202–03, 577 N.W.2d at 804; *see also Schneckloth,* 412 U.S. at 227. "The state's burden in a consent search is to show voluntariness, which is different from informed consent." *Xiong,* 178 Wis. 2d at 532, 504 N.W.2d at 430. We therefore add this limited information to the totality of the circumstances.

■ Upon review of all of the circumstances surrounding Lisa's consent to search the motel room, we conclude that the State has met its burden of showing that Lisa's consent was secured without the use of "actual coercive, improper police practices designed to overcome [her] resistance." *Id.* (quoted source omitted). We therefore conclude that under the application of the supreme court's analysis in *Phillips,* Lisa voluntarily consented to the search of the motel room.

consent, we utilize the testimony and facts that support the trial court's conclusion that consent was obtained.

■ This, however, does not end our inquiry. There is yet a question as to whether the evidence seized during the search should be excluded because it was obtained as a result of the officers exploiting their unlawful entry into the room. *See Phillips,* 218 Wis. 2d at 203, 577 N.W.2d at 805. While the analysis of this issue and the facts considered may overlap to some degree with the analysis of the voluntariness of Lisa's consent, the question of attenuation addresses a separate constitutional value. *See id.* at 204 n.9, 577 N.W.2d at 805 (citing *United States v. Melendez-Garcia,* 28 F.3d 1046, 1054 (10th Cir. 1994)). It must be determined not only that consent was voluntarily given, but that the evidence obtained was not an exploitation of the prior illegal entry. *See id.* The State has the burden to show "a sufficient break in the causal chain between the illegality and the seizure of evidence." *Id.* at 204, 577 N.W.2d at 805.

In *Brown,* 422 U.S. at 602, the Supreme Court considered what was required in order to break "the causal chain, between the illegal arrest and the statements made subsequent thereto." As outlined in *Wong Sun,* the question is whether the connection between the illegal police activity and the later consent has "become so attenuated as to dissipate the taint." *See Brown,* 422 U.S. at 598 (quoted source omitted). If Lisa's consent to search was obtained by the exploitation of prior illegal police activity, then any evidence obtained during the search must be excluded despite the voluntariness of the consent. *Cf. State v. Anderson,* 165 Wis. 2d 441, 448, 477 N.W.2d 277, 281 (1991).

When applying the attenuation theory, the following must be considered: (1) the temporal proximity of the misconduct and the subsequent consent to search, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. *See id.* We conclude that the instant case fails to provide sufficient indicia of attenuation, and the trial court's determination that the evidence seized during the search of the motel room was admissible must fail.

In applying the first factor, temporal proximity, we consider the amount of time between the police misconduct (the warrantless entry into the motel room) and the grant of consent, as well as any conditions which existed during that time. *See id.* at 449, 477 N.W.2d at 281. Toepfer, one of the officers who was part of the group that first entered the room, testified that it was "[n]o more than a few minutes" between the entry and the search. In the span of a few minutes, Lisa had emerged from the bathroom only to be confronted by five or six officers in her motel room. She was then informed that her husband had been arrested and that "drug paraphernalia" had been found in her husband's vehicle. On the heels of receiving this information, she was asked to consent to a search of the motel room.

Although the trial court emphasizes the fact that the officers were never told to leave and did not "immediately search," the time factor that the court points to is hardly significant. In fact, federal courts have repeatedly held that consent is not voluntary when in such close temporal proximity to a primary illegality. *See United States v. Gregory,* 79 F.3d 973, 979–80 (10th Cir. 1996) (passage of less than a minute between return of driver's license and request to search not sufficient to purge the taint of an illegal stop); *United*

*States v. McSwain,* 29 F.3d 558, 563 (10th Cir. 1994) (consent not voluntary when obtained "only a few minutes" after the illegal seizure); *United States v. Fernandez,* 18 F.3d 874, 883 (10th Cir. 1994) ("only moments" elapsed between illegal detention and seizure). The passage of a few minutes cannot be said to remove the taint of the warrantless entry. In *Rawlings v. Kentucky,* 448 U.S. 98, 107 (1980), the Supreme Court noted that under the strictest of custodial conditions, a forty-five minute time span might not be long enough to purge the primary taint. We are unable to conclude that the passage of a few minutes is enough to support the application of the attenuation doctrine to these facts.

Another factor to be considered is the presence of any intervening factors between the illegal entry and the consent to search. While there were several intervening factors between the entry of the officers and Lisa's consent to search, the factors as testified to appear to be aggravating factors, not attenuating factors. Only seconds after the illegal entry into the motel room, one of the officers informed Lisa that her husband had been arrested and drug paraphernalia had been found in the car. Lisa was alone in the room at the time.[6] Rollan, who observed the officers' entry, testified that Lisa appeared "very surprised at first." An officer then requested permission to conduct a search of the room, and, according to the officer, Lisa responded that she would like to put some "personal items" away first. This statement was met with a response that "for the safety of herself and [the] officers we would prefer that

------

[6] While testimony was conflicting on whether there was anyone else in the room when the officers entered, the trial court appears to have accepted the representations of Lisa and Rollan, who both testified that Lisa was alone.

she not worry about that and those personal items won't be disturbed." According to Cavalary, Lisa then consented to the search.

In this case, the intervening factors between the illegal entry and the consent do not vitiate the illegality. In fact, although the facts of the *Anderson* case were to the contrary, we conclude that Lisa was "improperly surprised, frightened, or confused" when confronted with the officers in her motel room. *See Anderson,* 165 Wis. 2d at 451, 477 N.W.2d at 282. The surprise engendered by the officers' unannounced entry and the information conveyed to her that her husband had been arrested, coupled with the very short amount of time that passed between the entry and the request for permission to search, make it more likely that the intervening circumstances served to exploit the primary illegality rather than vitiate it.

The third factor which must be considered is the flagrancy of the police misconduct. With regard to this factor, even more decisively than the two factors already considered, the conduct of the officers comes up short. While the following facts were not particularly pertinent to our earlier analysis of whether Lisa's consent was voluntarily given, consideration of the flagrancy of the police misconduct pursuant to an attenuation analysis requires that we consider all of the circumstances leading up to the illegal entry.

The evidence was that the police had placed the motel room occupied by the Bermudez group under surveillance for some period of time before Bermudez and Smith left.[7] After Bermudez and Smith drove

---

[7] The surveillance was initiated after police received a call from a motel security guard, Weber, who told police that he believed there was suspicious activity at one of the rooms. He informed police that there was "a lot of traffic in and out and to

away, their vehicle was subjected to a pretextual traffic stop. As a result of that stop and Bermudez's subsequent arrest for operating after suspension/revocation, the vehicle was searched and marijuana and a firearm were discovered. The officers at the motel were informed that the arrest had taken place. Very soon thereafter, six officers, including at least two from the metro drug unit, went to the motel room to inform Lisa that her husband had been arrested. On this pretext, the group, accompanied by Weber—who admitted he was carrying a motel passkey at the time—entered the room unannounced and within moments secured Lisa's consent to search the room.

It is disingenuous for the officers involved to testify that their only purpose in going to the motel room was to inform Lisa that her husband had been arrested. Six officers are not required for such a task. When the officers' assertion is coupled with the conflicting testimony of those present as to whether the door to the room was open or closed when they arrived, and not one officer was able to state with any degree of precision how entry to the room was gained, the flagrant misconduct takes on an air of purposefulness. We agree with appellate counsel's statement: "It is difficult to believe that all of these officers joined in the visit to this motel room simply to inform Ms. Bermudez of her husband's arrest." As revealed by their subsequent actions, the officers had an ulterior motive. Because the consent obtained from Lisa is not sufficiently atten-

---

and from the room, a lot of phone calls made from the room locally . . . and he felt that there were other individuals in the room that had not previously or initially rented the room." After the arrival of some additional metro drug unit officers, it was decided that the room and the motel parking lot should be placed under surveillance.

uated from the illegal entry and it appears that the officers exploited the primary illegality, the evidence seized during the resulting search must be suppressed.

The trial court set forth an alternative basis for sustaining the search when it reasoned that the entry into the motel room was permissible under a community caretaker function. The court reasoned that "because of the arrest of her husband out on the road" the officers' actions were justified. However, it is well settled that "[a] community caretaker action is one that is *totally divorced from the detection, investigation or acquisition of evidence relating to the violation of a criminal statute." State v. Ellenbecker,* 159 Wis. 2d 91, 96, 464 N.W.2d 427, 429 (Ct. App. 1990) (emphasis added). The facts preceding the officers' arrival at the motel room occupied by the Bermudez family belie any support for the officers' actions falling within a community caretaker role. The surveillance, arrest of two occupants of the room, discovery of drug paraphernalia in the car and presence of a half dozen officers all suggest a reason for the entry into the room quite apart from a desire to inform Lisa that her husband was under arrest. Instead, the facts suggest an orchestrated attempt to collect further incriminating evidence. There is no legal support for the entry and search under the community caretaker function.

## CONCLUSION

We are aware that in the *Phillips* case, cited extensively herein, the supreme court considered the attenuation doctrine under somewhat similar facts and ultimately upheld the defendant's consent to a search as sufficiently attenuated from an illegal entry. *See Phillips,* 218 Wis. 2d at 212, 577 N.W.2d at 808. As in the instant case, the illegal entry only preceded by min-

utes the grant of consent to search. After concluding that the short time span was not dispositive, the court pointed to the conditions which existed in that case: the defendant was not restrained, did not act annoyed or object to the agents' presence in the basement, and even led the agents into his bedroom where he turned over marijuana and drug paraphernalia. *See id.* at 206–07, 577 N.W.2d at 806.

However, the *Phillips* majority supported its analysis by alluding to a short discussion between one of the agents and the defendant during which it was explained that the agents did not have a search warrant. The court then concluded that the discussion "provided the defendant with sufficient information with which he could decide whether to freely consent to the search of his bedroom" and held that the agents did not exploit their unlawful entry by "surprising or misleading the defendant into consenting to the search." *Id.* at 208–09, 577 N.W.2d at 807.

Here, Lisa was not told that the officers did not have a warrant or that she did not have to consent to the search. Moreover, we conclude that the totality of the circumstances surrounding the police misconduct—the pretextual traffic stop following the room surveillance, the pretextual reason for approaching Lisa, the illegal entry into the motel room and the number of officers involved in the encounter at the room—combine to convince us that this search violated Bermudez's Fourth Amendment protections. We therefore conclude that the trial court erred in denying the motion to suppress and we reverse the judgment.

*By the Court.*—Judgment reversed.