STATE of Wisconsin, Plaintiff-Respondent,

v.

Charles A. WALLACE a/k/a LaShawn Thomas,
Defendant-Appellant.

Court of Appeals

*No. 00–3524–CR. Submitted on briefs October 5, 2001.—Decided
February 7, 2002.*

2002 WI App 61

(Also reported in 642 N.W.2d 549.)

626

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Martha K. Askins,* assistant state public defender of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the briefs of *Michael R. Klos,* assistant attorney general, and *James E. Doyle,* attorney general.

Before Vergeront, P.J., Deininger and Lundsten, JJ.

¶ 1. DEININGER, J. Charles Wallace appeals a judgment convicting him of possession of cocaine with the intent to deliver it.[1] Wallace claims the trial court erred in denying his motion to suppress evidence. He first contends that he was unlawfully detained after the police stopped his vehicle. Second, he contends that he did not voluntarily consent to a strip search and that the search violated Wisconsin's strip search statute. Finally, Wallace contends that, even if he consented to a strip search, the ensuing visual body cavity search exceeded the scope of his consent. We conclude that Wallace was not unlawfully detained and that he voluntarily consented to a strip search. However, because the trial court made no finding regarding whether

---

[1] It appears that Wallace's real name is LaShawn Thomas, but he claimed to be "Charles A. Wallace" when he was arrested. Because the appellant and respondent both refer to him as Wallace, and that is also the name used in the caption, we will refer to him as Wallace in this opinion.

Wallace consented to a visual body cavity search, we reverse and remand for a factual determination on this issue.

## BACKGROUND

¶ 2.   While City of Beloit police officers executed a search warrant at a Beloit residence, they observed a car drive past the house. One of the officers had information that the car had left the house prior to the search after its passengers were tipped off that police may be coming. He also had information that the individuals in the car were involved in selling drugs from the residence being searched, and that they "kept [drugs] in their underwear or in their rectal area." The officer instructed another officer to stop the car.

¶ 3.   The second officer subsequently stopped the car for displaying unauthorized license plates. Wallace was driving the car. Antoine Williams and two juveniles, who attended a local high school but were truant, were passengers in the car when it was stopped. The officer arrested Wallace for displaying unauthorized plates and Williams for contributing to the truancy of the two minors. After Wallace said that he lived in Illinois, the police informed him that because he was an out-of-state resident he would have to post a cash bond. Officers then transported Wallace and Williams to the Beloit Police Department to post bond.

¶ 4.   One of the arresting officers testified at the suppression hearing that, while at the police station booking area, "we indicated our suspicions about their presence and activity at the [address being searched]. We also indicated that we'd like them to consent to a strip search. Both individuals said that they would." Williams was searched first. Prior to the search of

631

Wallace, Williams posted bond for himself and Wallace. Wallace was then taken to a holding cell and searched. An officer testified as follows:

> A: I believe we searched his pockets, had him remove his shirt . . . [and] take his pants down. They fell to the floor. He removed his underwear . . . partially down. We had him bend over and spread his buttocks apart, and Officer Summers then stated that he had observed some plastic in [Wallace's] rectal area.
>
> Q: . . . [W]hat happened after there was discovery of the plastic?
>
> A: I believe . . . we had him . . . remove his underwear and his pants completely . . . and Officer Summers asked him to bend over further and spread his buttocks apart further, and he did this . . . . Officer Summers then advised that he had observed a package of what he believed [was] cocaine on the floor, so then he grabbed [Wallace's] wrist area so that he couldn't pick . . . the evidence back up. I then got a pair of rubber gloves and picked up the package of cocaine.

Another officer gave the following account:

> A: I asked him if he would spread his butt cheeks, and he placed his hands on his cheeks, and he appeared to be having difficulty spreading his cheeks. I indicated to him that if he was willing to allow us to check his rectal area . . . he would have to spread his cheeks further than that.
>
> Q: Then what happened?
>
> A: Then he spread his cheeks not as far as I believe he could have, but apart, and I observed a piece of plastic material between his cheeks near his rectal area.

632

¶ 5. The officers arrested Wallace for possession of cocaine with intent to deliver it. Later the same day, Wallace gave a statement. In it, Wallace said that he had consented to a strip search; that he was not threatened or coerced into consenting to the search; that the cocaine was his; and that he was going to use the money obtained from selling the cocaine to rent a car. When asked whether he knew he did not have to allow the search, Wallace replied, "No."

¶ 6. Wallace moved to suppress the seized evidence and the statement. He asserted that the traffic stop was unlawful and that the officers unlawfully detained him when they required him to post bond instead of releasing him. He also claimed that the subsequent strip search violated both state law and the Fourth Amendment. The circuit court denied his motion. In its written decision, the court concluded that both Wallace's stop and his detention were lawful. The court found that police had information that Wallace was an Illinois resident, and that the Beloit Police Department had a policy which requires out-of-state residents to post cash bond before being released.

¶ 7. The court further concluded that although the strip search did not comply with Wis. Stat. § 968.255 (1999–2000),[2] Wallace had voluntarily consented to the strip search, and that police therefore did not violate his rights under either the statute or the Fourth Amendment. Wallace subsequently pled guilty and now appeals his conviction.[3]

[2] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

[3] *See* Wis. Stat. § 971.31(10) ("An order denying a motion to suppress evidence or a motion challenging the admissibility of a statement of a defendant may be reviewed upon appeal from a

## ANALYSIS

¶ 8.   A circuit court's ruling on a motion to suppress evidence presents a mixed question of fact and law. We will not reverse the circuit court's factual findings unless they are clearly erroneous. *State v. Roberts*, 196 Wis. 2d 445, 452, 538 N.W.2d 825 (Ct. App. 1995). However, whether those facts satisfy the constitutional requirement of reasonableness presents a question of law that we review de novo. *State v. Jackson*, 147 Wis. 2d 824, 829, 434 N.W.2d 386 (1989).

## I.

¶ 9.   We first address Wallace's contention that the Beloit police officers unlawfully prolonged his detention to obtain his consent to a strip search. The detention of a person during an investigative stop, even if only temporary and brief, constitutes a "seizure" under the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809 (1996). Thus, not only the basis for the stop, but also the duration and scope of the stop, must be reasonable under the Fourth Amendment. *Florida v. Royer*, 460 U.S. 491, 500 (1983).

¶ 10.   Wallace concedes that the police lawfully stopped his car for displaying unauthorized license plates. *See Terry v. Ohio*, 392 U.S. 1, 20–22 (1968). He also concedes that he was lawfully taken into custody pursuant to Beloit Police Department policy, which requires out-of-state residents to post bond prior to release. Wallace, however, challenges the duration and

---

judgment of conviction notwithstanding the fact that such judgment was entered upon a plea of guilty.").

scope of the stop. He asserts that, because he was arrested for only a traffic violation, and because officers had already conducted a pat down and determined he was unarmed, their subsequent request to conduct a strip search was unjustified. *See id.* at 29 ("[E]vidence may not be introduced if it was discovered by means of a seizure and search which were not reasonably related in scope to the justification for their initiation."). The strip search request, he argues, unreasonably extended his detention because it was not reasonably related to his traffic violation.

¶ 11.   We addressed a closely related issue in *State v. Gaulrapp*, 207 Wis. 2d 600, 558 N.W. 696 (Ct. App. 1996), where we concluded that police questioning on a subject unrelated to the initial reason for the stop did not violate the constitution because it did not unreasonably extend the duration of the detention. *Id.* at 607–09. Police stopped the defendant in *Gaulrapp* for a defective muffler. *Id.* at 603. One of the officers then asked him if he had any drugs or weapons inside his vehicle and he replied that he did not. *Id.* The officer then asked if they could search his person and his vehicle and he consented. *Id.* The officers found cocaine on his person and marijuana in his truck. *Id.* at 603–04. The defendant moved to suppress the evidence claiming that the police unlawfully expanded the scope of the traffic stop by asking him questions about drugs and weapons. *Id.* at 604. The circuit court denied his motion and we affirmed. *Id.* We concluded that "it is the extension of a detention past the point reasonably justified by the initial stop, not the nature of the questions asked, that violates the Fourth Amendment," and we concluded that the police had not unreasonably prolonged Gaulrapp's detention. *Id.* at 609.

¶ 12.   Similarly, we conclude here that the officers' request for consent to conduct a strip search did not unreasonably prolong Wallace's detention. The circuit court's findings based on the evidence at the suppression hearing support this conclusion. The strip search was conducted within thirty minutes of Wallace's arrival at the police station. The officers made their request before Wallace's bond was posted. Because Wallace was still waiting for his bond to be posted, the officer's request for consent did not prolong his detention at all.

■

¶ 13.   Wallace claims that the officers' motivation for the traffic stop and his subsequent detention was to discover evidence of drug activity, and that this purpose had nothing to do with the traffic offense for which he was arrested. This may well be true, but we rejected this argument in *Gaulrapp*. Rather, we concluded that "[t]he subjective intentions of the officers do not make the continued detention illegal as long as the officers have . . . probable cause or reasonable suspicion to detain in the first instance." *Id.* at 609–10; *see also Whren*, 517 U.S. at 813. That is, the lawfulness of a detention does not turn on the subjective intentions of the officers but on whether they unreasonably prolong a detention in order to obtain consent for a search. As we have explained, that did not happen here.

■

¶ 14.   Wallace also contends that the police should have informed him that after his bond was posted he would be free to go. Once again, *Gaulrapp* is dispositive. An officer is not required to inform a lawfully seized person that he or she is free to leave after the conclusion of a lawful stop. *Gaulrapp*, 207 Wis. 2d at 607; *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).

¶ 15.   Finally Wallace contends that his detention was unlawfully prolonged because his statement was not taken until four hours after the initial traffic stop. Our focus, however, is on whether the officers' request for consent to conduct a strip search unreasonably prolonged his detention, not on what transpired after police had conducted the search and found cocaine on Wallace's person. The taking of his statement several hours later did not affect the lawfulness of Wallace's detention because he was then under arrest for the possession offense. *See Gaulrapp*, 207 Wis. 2d at 609 (explaining that the duration of the search itself and events which flow from it do not impact on the question of whether a detention was unreasonably prolonged to obtain consent).

## II.

¶ 16.   We next address Wallace's contention that he did not voluntarily consent to the strip search. Whether Wallace consented to a strip search is a question of fact, reviewed on the clearly erroneous standard. *State v. Schwegler*, 170 Wis. 2d 487, 498, 490 N.W.2d 292 (Ct. App. 1992). Whether the consent was voluntary, however, is a question of "constitutional fact," which we review independently of the circuit court, applying constitutional principles to the facts as found by the trial court. *State v. Phillips*, 218 Wis. 2d 180, 194, 577 N.W.2d 794 (1998). Although Wallace does not necessarily concede that he consented to be strip searched, his principal claim is that any consent he may have given was not given voluntarily.

637

¶ 17. Consent is one of the well-established exceptions to the Fourth Amendment's warrant requirement. *Id.* at 196. The consent, however, must be a " 'free, intelligent, unequivocal and specific consent without any duress or coercion, actual or implied.' " *State v. Johnson,* 177 Wis. 2d 224, 233, 501 N.W.2d 876 (Ct. App. 1993) (citation omitted). The State carries the burden to prove by clear and convincing evidence that a consent was voluntary. *Id.* In determining whether consent is voluntary, "[w]e look to the totality of the circumstances, considering both the events surrounding the consent and the characteristics of the individual whose consent is sought." *State v. Bermudez,* 221 Wis. 2d 338, 348, 585 N.W.2d 628 (Ct. App. 1998). No single criterion, however, controls our decision. *Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973). Among the factors we consider in determining the voluntariness of consent are:

> [W]hether any misrepresentation, deception or trickery was used to entice the defendant to give consent; whether the defendant was threatened or physically intimidated; the conditions at the time the request to search was made; the defendant's response to the agents' request; the defendant's general characteristics, including age, intelligence, education, physical and emotional condition, and prior experience with the police; and whether the agents informed the individual that consent to search could be withheld.

*Bermudez,* 221 Wis. 2d. at 349.

¶ 18. Wallace argues that his consent to be strip searched was a "mere submission to authority, and not true voluntary consent." He points to the facts that he was at the police station, and that he had been there for thirty minutes when the request was made. We ac-

knowledge that the fact the request was made while Wallace was detained at the police station is a factor to be considered in examining the voluntariness of his consent. *See United States v. Watson*, 423 U.S. 411, 424 (1976) The Court concluded in *Watson* that although custody is one factor to be considered in determining voluntariness, it is not in itself dispositive. *See id*. Thus, the fact that police made the request while Wallace was being detained at the police station does not necessarily end our inquiry.

¶ 19. The police made their request during the booking process and before Wallace's bond had been posted. We concur with the circuit court's conclusion that thirty minutes, devoted as it was to legitimate custodial activities, does not represent an unreasonably lengthy period of custodial detention so as to vitiate the voluntariness of Wallace's consent. The record before us contains no evidence that police created a coercive atmosphere in order to obtain Wallace's consent, nor is there any evidence that they misrepresented their purpose or authority in making the request to search. *See, e.g., Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968) (where consent to search a home was obtained as a result of a police officer's false claim of lawful authority, that consent is invalid). Furthermore, there is no evidence, nor does Wallace contend, that the officers used force, threats or coercion to obtain Wallace's consent to the search.

¶ 20. In his post-search statement, when asked whether he knew he did not have to allow the search, Wallace replied, "No." Wallace contends that he should have been informed that he did not have to consent to the search. This was the precise issue before the Supreme Court in *Schneckloth*, and the Court held that, "while the subject's knowledge of a right to refuse is a

639

factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." *Schneckloth*, 412 U.S. at 249 (footnote omitted); *see also State v. Rodgers*, 119 Wis. 2d 102, 110, 349 N.W.2d 453 (1984) (the State's burden in a consent search is to show voluntariness, which is different from informed consent).

¶ 21.  Wallace also contends that he was not specifically asked if he would consent to the search but was *told* that the police "would like [him] to consent to a strip search." The trial court specifically found, however, that "[t]he Police *asked* Wallace if he would consent to a strip search" (emphasis added). This finding is supported by testimony at the suppression hearing that an officer "asked [Wallace] specifically if he would allow us to strip search him, if he would consent."

¶ 22.  Finally, in considering Wallace's personal characteristics, we are not persuaded that his age (twenty) and his having a "minimal prior record" rendered Wallace particularly vulnerable to police intimidation, and therefore susceptible to consenting against his will, as he argues. Wallace presented no evidence that he lacked education or was cognitively deficient. Neither does it appear that Wallace was particularly anxious or frightened by his circumstances. Wallace did not testify at the suppression hearing, but the police noted Wallace's demeanor as being "calm" in the arrest report following his strip search.

¶ 23.  After reviewing the totality of the circumstances surrounding Wallace's consent to be strip searched, we conclude that the State has met its burden of showing that the consent was voluntary.

## III.

■

¶ 24.   Wallace next contends that the strip search was illegal because it violated Wis. Stat. § 968.255.[4] The circuit court concluded that the strip search of Wallace violated the statute because Wallace was not a "detained person," as the statute defines the term, and because the search was not authorized by the chief of police as the statute requires. The court concluded, however,

---

[4] The relevant provisions of Wis. Stat. § 968.255 are:

(1) In this section:

(a) "Detained" means any of the following:

1. Arrested for any felony.

2. Arrested for any misdemeanor under s. 167.30, 940.19, 941.20(1), 941.23, 941.237, 941.24, 948.60, 948.605(2)(a) or 948.61.

3. Taken into custody under s. 938.19 and there are reasonable grounds to believe the juvenile has committed an act which if committed by an adult would be covered under subd. 1. or 2.

4. Arrested for any misdemeanor not specified in subd. 2., any other violation of state law punishable by forfeiture or any local ordinance if there is probable cause to believe the person is concealing a weapon or a thing which may constitute evidence of the offense for which he or she is detained.

. . . .

(2) No person may be the subject of a strip search unless he or she is a detained person and if:

. . . .

(d) A person conducting the search has obtained the prior written permission of the chief, sheriff or law enforcement administrator of the jurisdiction where the person is detained, or his or her designee, unless there is probable cause to believe that the detained person is concealing a weapon . . . .

The State concedes that Wallace was not a "detained person" within the meaning of the statute.

that Wallace had waived his rights under the statute by consenting to the search. Wallace claims this was error because the statute's language suggests universal applicability ("*[n]o person* may be the subject of a strip search unless [the statutory requirements are met]," § 968.255(2) (emphasis added)), and it contains no exception for consensual searches.

¶ 25.   We conclude, however, that we need not address whether police may conduct a consensual strip search free of the statutory restrictions. Absent a constitutional violation, a court may not suppress evidence obtained in violation of a statute except where the statute "specifically requires suppression of wrongfully or illegally obtained evidence as a sanction." *State ex. rel. Peckham v. Krenke*, 229 Wis. 2d 778, 787, 601 N.W.2d 287 (Ct. App. 1999). WISCONSIN STAT. § 968.255 does not require suppression of evidence obtained in violation of its provisions.[5]

IV.

¶ 26.   The final issue we address is whether Wallace's consent to a strip search encompassed the more intrusive body cavity search that the police ultimately conducted. After reviewing the parties' initial briefs, we requested supplemental briefing on the following question:   Assuming Charles Wallace gave con-

---

[5] WISCONSIN STAT. § 968.255(4) provides the following remedy:   "A person who intentionally violates this section may be fined not more than $1,000 or imprisoned not more than 90 days or both." Subsection (5) further provides that the statute "does not limit the rights of any person to civil damages or injunctive relief."

sent to a strip search, did the scope of consent extend to having Wallace bend over and spread his buttocks? We specifically invited the parties to call our attention to cases from other jurisdictions that address the issue of what constitutes a valid consent to a search of the nature conducted in this case.

¶ 27. The State concedes that Wallace was subjected to a "visual body cavity search" and that this type of search is distinguishable from a "strip search."[6] The Virginia Court of Appeals described the difference between them as follows:

> A search of the person may range from a *Terry*-type pat-down to a generalized search of the person to the more intrusive strip search or body cavity search. "A strip search generally refers to an inspection of a naked individual, without any scrutiny of his body cavities. A visual body cavity search extends to a visual inspection of the anal and genital areas." ... "A 'manual body cavity search' includes some degree of touching or probing of body cavities."

*Hughes v. Commonwealth*, 524 S.E.2d 155, 159 (Va. Ct. App. 2000) (citations omitted). The court also noted in *Hughes* that the search there at issue "became a visual body cavity search when [the officer] had [the defen-

[6] We note that the definition of "strip search" in WIS. STAT. § 968.255(1)(b) encompasses body cavity searches: " 'strip search' means a search in which a detained person's genitals, pubic area, buttock or anus ... is uncovered and either is exposed to view or is touched by a person conducting the search." Our present inquiry, however, is not whether this statute applies to the search at issue, but whether Wallace voluntarily consented to the search, thereby obviating the need for a search warrant under the Fourth Amendment.

dant] bend over to expose his anus," *id.*, and that a "body cavity search is more intrusive than a strip search." *Id.* at 161.

¶ 28.  The U.S. Supreme Court views all searches of a person's body as highly intrusive invasions of one's privacy. Addressing only the limited "pat-down" search of a suspect in *Terry*, the Supreme Court explained that, "[e]ven a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience." *Terry*, 392 U.S. at 24–25. Because of their significantly greater degree of intrusiveness, searches such as the one conducted in this case are closely scrutinized when challenged under the Fourth Amendment. Although the Court upheld visual body cavity searches of inmates in *Bell v. Wolfish*, 441 U.S. 520 (1979), it acknowledged that "this practice instinctively gives us the most pause." *Id.* at 558. Two dissenting justices were more emphatic, labeling the searches "one of the most grievous offenses against personal dignity and common decency," *id.* at 576–77 (Marshall, J., dissenting), and "a clear affront to the dignity of the detainee as a human being." *Id.* at 592 (Stevens, J., dissenting). Similarly, the Seventh Circuit has described searches "involving the visual inspection of the anal and genital areas as 'demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission.' " *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1272 (7th Cir. 1983).

¶ 29.  We have concluded that Wallace voluntarily consented to a strip search, and the parties agree that a visual body cavity search was ultimately conducted.

Given the conceded distinction between the two types of searches, as well as the heightened level of scrutiny with which we are to view police conduct involving highly intrusive body cavity searches, we are unwilling to hold that a valid consent to the former always suffices as a consent to the latter. Thus, two inquiries remain: First, did the scope of Wallace's initial consent to be strip searched include consent to the visual body cavity search that was actually conducted? If not, did Wallace subsequently consent to the visual body cavity search during the process of being strip searched? We conclude that we must answer no to the first question, and that we cannot answer the second without further factual findings by the circuit court.

¶ 30. In general, "[a] consent search is constitutionally reasonable to the extent that the search remains within the scope of the actual consent." *State v. Rogers*, 148 Wis. 2d 243, 248, 435 N.W.2d 275 (Ct. App. 1988). The State contends that the visual body cavity search was within the scope of Wallace's consent to be strip searched. The U.S. Supreme Court's decision in *Florida v. Jimeno*, 500 U.S. 248 (1991), provides guidance for determining whether a search exceeds the scope of consent.

¶ 31. The arresting officer in *Jimeno* had information that a suspect was involved in drug trafficking when the officer stopped him for a traffic violation. *Id.* at 249. The officer told the suspect why he was stopped and then requested permission to search his car, telling him that he had reason to believe he was carrying narcotics in his car. *Id.* at 249–50. The suspect agreed to the search. *Id.* at 250. The officer found a brown paper bag on the floor and on opening it, found cocaine. *Id.* The evidence was suppressed after the trial court found

that the defendant's "mere consent to search the car did not carry with it specific consent to open the bag and examine its contents." *Id.* The ruling was affirmed by the Florida District Court of Appeal and the Florida Supreme Court. The Supreme Court reversed, however, stating:

> The scope of a search is generally defined by its expressed object. In this case, the terms of the search's authorization were simple. Respondent granted Officer Trujillo permission to search his car, and did not place any explicit limitation on the scope of the search. Trujillo had informed respondent that he believed respondent was carrying narcotics, and that he would be looking for narcotics in the car. We think that it was objectively reasonable for the police to conclude that the general consent to search respondent's car included consent to search containers within that car which might bear drugs. A reasonable person may be expected to know that narcotics are generally carried in some form of a container . . . . The authorization to search in this case, therefore, extended beyond the surfaces of the car's interior to the paper bag lying on the car's floor.

*Id.* at 251 (citations omitted).

¶ 32.   Relying on the foregoing, the State contends that because Wallace consented to a strip search whose known purpose was to find drugs, that "[i]t was 'objectively reasonable' for the officers to conclude that Wallace's consent to a strip search included a visual search of his anal area where drugs could be concealed." We disagree.

¶ 33.   A general consent to the search of one's vehicle for drugs may reasonably be taken to include consent to the search of a paper bag lying on the vehicle's floor. We conclude, however, that a different

result obtains when the question is whether the scope of a general consent to one type of bodily search may reasonably be extended to include a more intrusive bodily search. Just as when weighing the competing interests in a Fourth Amendment challenge, greater intrusiveness in a search must be offset by greater justification for the search,[7] we conclude that reasonableness requires a high degree of specificity when consent is relied upon as the basis for a highly intrusive body cavity search.

¶ 34.  Given the degree of the invasion of Wallace's privacy, if the officers intended to have Wallace bend over and spread his buttocks as a part of their search, they should have asked him to specifically consent to that level of intrusiveness. Put another way, it was not "objectively reasonable" for police to conclude that the consent they obtained from Wallace for a strip search included anything beyond the removal of Wallace's clothes in order to inspect his naked body, but "without any scrutiny of his body cavities." *See Hughes,* 524 S.E.2d at 159, 161 (holding that a defendant who consented to a pat-down search and a search of his underwear to "check further," did not thereby consent to a visual inspection of his anus).

¶ 35.  The State maintains, however, that even if Wallace's initial consent to a strip search did not extend to the visual inspection of his anal cavity, he subse-

---

[7] *See Security and Law Enforcement Employees, Dist. Council 82 v. Carey,* 737 F.2d 187, 208 (2nd Cir. 1984) (" '[T]he greater the intrusion, the greater must be the reason for conducting a search.' " (citation omitted)); *United States v. Quintero-Castro,* 705 F.2d 1099, 1100 (9th Cir. 1983) (" '[A]s a search becomes more intrusive, it must be justified by a correspondingly higher level of suspicion of wrongdoing.' " (citation omitted)).

quently consented when he complied with the request to bend over and spread his buttocks. Again we disagree. The circuit court made no specific finding regarding whether Wallace at any time gave his consent for a visual body cavity search. The court found that the following transpired during the search:

> The defendant then removed his underwear partially down and the Police *had him* bend over and spread his buttocks apart. At this time, [an officer] observed some plastic in [Wallace's] rectal area. The Police *had Mr. Wallace bend over further* and separate his buttocks apart further.

(Emphasis added.) This finding could be interpreted to mean that the court concluded Wallace, at that point, simply acquiesced to police orders. However, because of "the highly intrusive and personal nature of body cavity searches . . . consent to such a search will not be inferred from a suspect's silence or apparent acquiescence to an officer's progressively extending the scope of a consensual generalized search." *Id.* at 161.

¶ 36.   The testimony regarding what transpired during the search is also somewhat equivocal on the issue of whether Wallace consented to the police requests to bend over and spread his buttocks. One officer testified as follows:

> I asked him if he would spread his butt cheeks, and he placed his hands on his cheeks, and he appeared to be having difficulty spreading his cheeks. I indicated to him that if he was willing to allow us to check his rectal area . . . he would have to spread his cheeks further than that.
>
>   . . .[H]e spread his cheeks not as far as I believe he could have, but apart, and I observed a piece of plastic material between his cheeks near his rectal area.

Wallace's apparent reluctance to comply with the police request, as evidenced by this testimony, could give rise to an inference that Wallace either revoked or refused consent to a visual search of his anal cavity.

¶ 37.   As we have noted, whether consent was given is a question of fact. *Schwegler*, 170 Wis. 2d at 498.[8] We therefore remand this case to the circuit court for a factual determination regarding whether Wallace, at some point during the consensual strip search, gave his further consent to the more intrusive search which ensued. In making this determination, the court should consider both the wording of the officers' requests and Wallace's responses to them in order to determine whether what transpired was the giving of consent or acquiescence to police orders. We leave it to the court's discretion to make the necessary determination on the present record if it can do so, or to take additional testimony on the issue if it deems that to be advisable. If the court determines that Wallace consented to the visual search of his anal cavity, it must then determine whether he did so voluntarily. If the court answers both questions in the affirmative, it should order the appealed judgment of conviction reinstated. *See State v. Stevens*, 217 Wis. 2d 369, 577 N.W.2d 335 (1998); *State v. Meyer*, 216 Wis. 2d 729, 576 N.W.2d 260 (1998).

## CONCLUSION

¶ 38.   For the reasons discussed above, we reverse the judgment and remand the cause to the circuit court

---

[8] We note further that it is the State's burden to prove Wallace's consent to the body cavity search that was conducted, and that it must do so by clear and convincing evidence. *State v. Schwegler*, 170 Wis. 2d 487, 498, 490 N.W.2d 292 (Ct. App. 1992).

for further proceedings consistent with this opinion. If the court determines that the visual body cavity search did not violate the Fourth Amendment, the court shall reinstate the judgment of conviction.

*By the Court.*—Judgment reversed and cause remanded with directions.