COURT OF APPEALS
DECISION
DATED AND FILED

May 25, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP487-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2016CF712**

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

MARTEZ COLUMBUS FENNELL,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County: MARK A. SANDERS and STEPHANIE ROTHSTEIN, Judges. *Affirmed*.

Before Brash, P.J., Graham and White, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Martez Columbus Fennell was convicted by a jury of first-degree reckless homicide as a party to a crime. Fennell sought postconviction relief, alleging that his trial counsel was ineffective for not attempting to suppress text messages that were gathered from a Kyocera cellphone pursuant to a warrant.[1] He argues that the circuit court erred by denying his postconviction motion without a hearing and that the trial evidence was insufficient to support his conviction. We disagree and affirm.

## BACKGROUND

¶2 On November 22, 2015, at 5:07 a.m., Milwaukee police responded to a 911 call about a shooting in an alley near 8329 West Congress Street. The victim, T.H., had been shot several times and was pronounced dead at the scene.

¶3 At 5:11 a.m. that same morning, Fennell arrived at St. Joseph's Hospital with five gunshot wounds. Fennell had been driven to the hospital by his girlfriend, Wanliz Velazquez. When police interviewed Velazquez, she indicated that Fennell was shot near North 84th Street and West Congress. Velazquez gave police a black Kyocera cellphone, and she told the officers that the phone belonged to Fennell. A second cellphone was found in the pocket of the jeans Fennell wore to the hospital; it is not clear from the record whether police ever searched the contents of that second phone.

¶4 Police applied for and successfully obtained a search warrant for the Kyocera cellphone. The warrant application was accompanied by the affidavit of

---

[1] The Honorable Mark A. Sanders presided over the trial and entered the judgment of conviction. The Honorable Stephanie Rothstein entered the order denying the postconviction motion.

Detective Nicholas J. Johnson, and the contents of this affidavit are addressed in greater detail in the discussion section below. A search of the phone uncovered four text messages that had been sent in the early morning hours leading up to the shooting from a phone number associated with a man named Dovone Jackson. Fennell argues that the contents of these four messages, discussed below, were the "lynchpin" of the case against him.

¶5 The case proceeded to a four-day jury trial, and Jackson was one of the many witnesses to testify on behalf of the State. Jackson had already been convicted of conspiracy to commit armed robbery in connection with T.H.'s death, and he had been sentenced to fifteen years of initial confinement. He told the jury that he had agreed to testify at Fennell's trial in the hopes of reducing his sentence. Later, when reading the jury instructions, the court specifically informed the jury that Jackson had received "concessions" for his testimony. The circuit court instructed the jury to "consider whether [Jackson's] hope that his testimony will result in a reduced sentence affected the testimony and give [it] the weight you believe it is entitled to receive."

¶6 Jackson testified as follows. He and a man called "Breed" knew that T.H. kept money, drugs, and other valuables in his apartment, and they had a long-running plan to burglarize it. At some point, Jackson asked Fennell if he would assist with the burglary, and Fennell said he would. Jackson and Fennell planned to bring weapons to the burglary, and they had been watching T.H.'s apartment for at least a month, looking for an opportunity to break in. On the morning that T.H. was shot, Jackson and Fennell expected T.H. and his wife to be attending a party at Breed's place.

¶7      Jackson confirmed that he sent the text messages that were found on the Kyocera cellphone, and he testified about the circumstances under which he sent those messages. When Jackson saw T.H. at Breed's party, T.H. was carrying a gun and had a large sum of cash and jewelry on him. At 3:35 a.m., Jackson texted Fennell: "He here with a thousand singles, one pistol, and the watch. Breed just hoed him." Jackson testified that meant that Breed accused T.H. of stealing from him. At 3:42 a.m., Jackson texted: "Earring. ND. And Bhain."[2] Jackson explained that he texted these updates so that Fennell would know "what [T.H.] had on him." At 4:47 a.m., Jackson texted: "He on his WA, take him DMWN, go on S4TE."[3] Finally, at 4:50 a.m., Jackson texted: "rat on his … way, to take the snake. Are you hungry? Eat."[4] Jackson confirmed that he was referring to Fennell as the "snake" in this final text message. Jackson also confirmed that Fennell never replied to these four text messages and that he did not know whether Fennell had his phone on him the morning T.H. was shot.[5]

---

[2] A police officer testified that he interpreted "ND Bhain" as a typo that meant "and chain." The officer testified that he was aware that T.H. had been wearing a large chain around his neck when he attended Breed's party.

[3] The officer testified that he interpreted this message to mean "he is on his way, take him down," and possibly "go on site."

[4] The officer inferred that the "snake" referred to Fennell because Fennell has a tattoo of a snake on his arm.

[5] A report with these and other text messages was generated, marked as State's Exhibit 88, and displayed to the jury. However, it was apparently not admitted into evidence, and it is not a part of the record on appeal. The parties appear to agree on the spelling, capitalization, and punctuations of the text messages that were displayed to the jury, but we are unable to confirm their accuracy by reference to the exhibit.

The trial transcripts also include testimony about text messages sent between Fennell and Jackson in the days leading up to the shooting. During trial, the prosecution suggested that these texts were related to them casing the apartment and planning a burglary. Neither party discusses these texts in any detail in their appellate briefs, therefore we discuss them no further.

¶8    T.H.'s wife testified as follows. T.H. had gone to a party at Breed's place the night before he was shot, and she stayed at home. Around 1:30 a.m., someone knocked on their apartment door, and she saw an unfamiliar man wearing a red hoodie, a black jacket, dark pants, and a cap. The man told her that he had the "wrong doorbell," and as he walked away, he took out his phone as if he was about to make a call. Then, at approximately 5:00 a.m., she heard gunshots, looked out the window, and saw T.H. fighting with someone. She called 911 after discovering that T.H. had been shot.

¶9    The State introduced DNA evidence at trial that linked Fennell to T.H.'s body and to the crime scene. Fennell's DNA was found under T.H.'s fingernails, and Fennell's blood was found in the alleyway where T.H. was killed. Fennell had been wearing a red sweatshirt when he was admitted to the hospital, and according to DNA analysis, the blood on the sweatshirt belonged to Fennell and to T.H. Additionally, an analyst testified that the bullet surgically removed from Fennell's arm had been fired from the same gun that discharged other casings that were found at the crime scene.

¶10    Fennell testified in his defense as follows. He did not plan a burglary with Jackson. Jackson had talked about robbing T.H., but Fennell took it as a joke and did not take Jackson seriously. Fennell did not carry a gun that night or any other night.

¶11    Fennell further testified that he did not go to T.H.'s apartment in the early morning hours of November 22; instead, at approximately 1:30 a.m., he was helping his cousin change a flat tire. Then, at about 3:00 a.m., Fennell was playing cards and drinking at a friend's house near 10th Street and Keefe Avenue. Fennell, his cousins, and Velazquez left at around 4:30 a.m., and one of Fennell's

cousins asked Fennell to buy him some marijuana. Fennell borrowed his cousin's phone to call Jackson, and Jackson told Fennell to come to 83rd Street. When Fennell arrived, he saw Jackson and T.H. talking. As he approached, "some guys c[a]me out" and "started shooting." Fennell was shot during the exchange of gunfire, and he "ran into [T.H.]" as he was "trying to get away."

¶12 Fennell testified that he had lost track of his Kyocera cellphone that night, and he did not know where it was or whether it was powered on or off. Fennell did not see the text messages from Jackson when they were sent; the first time he saw the text messages was after he was arrested when he received them from his attorney.

¶13 On cross-examination, Fennell admitted that he spoke to police on several occasions while being treated at the hospital, and each time, he told officers that he had been shot by masked men who attempted to rob him near 10th and Keefe. He indicated that, at the time he spoke with police, he was in and out of consciousness from his wounds and did not remember that he had actually been shot near 83rd and Congress. According to Fennell, he did not remember that he had been shot at the scene where T.H. was killed until he received the State's discovery responses, which placed his DNA at the scene of the crime.

¶14 The jury found Fennell guilty of first-degree reckless homicide as a party to a crime. The State had also charged Fennell with being a felon in possession of a firearm, however, the jury acquitted him of that charge.

¶15 Fennell filed a postconviction motion seeking a *Machner*[6] hearing and a new trial based on a claim of ineffective assistance of counsel. He alleged that the warrant to search the Kyocera cellphone should not have been issued because it was not supported by probable cause, that the text messages should have been suppressed as fruits of an unlawful search, and that his trial counsel's failure to challenge the warrant prejudiced his defense. The circuit court rejected Fennell's claim that the warrant to search his phone was defective and further concluded that there was no reasonable probability that the trial's outcome would have been different without the messages. The court denied the motion without a hearing, and this appeal follows.

## DISCUSSION

¶16 Fennell argues that the circuit court erred by denying his postconviction motion without holding a *Machner* hearing. He also contends that the evidence was insufficient to support a guilty verdict. WIS. STAT. § 974.02(2) (2019-20).[7] We address each argument in turn.

### I. Ineffective Assistance of Counsel

¶17 A circuit court is not required to hold a *Machner* hearing on allegations of ineffective assistance of counsel if, among other things, "'the record conclusively demonstrates that the defendant is not entitled to relief.'" *State v. Bentley*, 201 Wis. 2d 303, 309-10, 548 N.W.2d 50 (1996) (citation omitted); *State*

---

[6] *See State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

[7] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

*v. Allen*, 2004 WI 106, ¶9, 274 Wis. 2d 568, 682 N.W.2d 433. To show ineffective assistance of counsel, a defendant must establish that their counsel's performance was deficient, and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). When the salient facts are undisputed, both inquiries present questions of law that we review de novo. *State v. Scott*, 230 Wis. 2d 643, 656-57, 602 N.W.2d 296 (Ct. App. 1999).

## A. Deficient Performance

¶18 Deficient performance means legal representation that falls below "'an objective standard of reasonableness.'" *State v. Breitzman*, 2017 WI 100, ¶38, 378 Wis. 2d 431, 904 N.W.2d 93 (citation omitted). Where trial counsel's failure to litigate a Fourth Amendment issue is the basis for an allegation of ineffectiveness, the defendant must also prove that the issue would have been meritorious. *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986); *State v. Jackson*, 229 Wis. 2d 328, 344, 600 N.W.2d 39 (Ct. App. 1999). Trial counsel's failure to challenge the admission of evidence is not deficient performance if that challenge would have been unsuccessful. *State v. Wheat*, 2002 WI App 153, ¶23, 256 Wis. 2d 270, 647 N.W.2d 441.

¶19 According to Fennell, his trial counsel should have filed a motion to suppress the text messages on the ground that the warrant to search the Kyocera cellphone was not supported by probable cause. When asked to issue a search warrant, a neutral and detached magistrate must determine whether there is probable cause to believe that a search of the place described in the warrant will uncover evidence linked to the commission of a crime. *State v. Higginbotham*, 162 Wis. 2d 978, 989, 471 N.W.2d 24 (1991); *State v. Herrmann*, 2000 WI App 38, ¶22, 233 Wis. 2d 135, 608 N.W.2d 406. Probable cause is a "'flexible'" and

"'practical commonsense decision,'" ***State v. Silverstein***, 2017 WI App 64, ¶22, 378 Wis. 2d 42, 902 N.W.2d 550 (citations omitted), and it means a "fair probability" that evidence of a crime will be found, ***Illinois v. Gates***, 462 U.S. 213, 238 (1983). After a warrant has been issued, the defendant bears the burden to prove that it was issued in error. ***State v. Edwards***, 98 Wis. 2d 367, 376, 297 N.W.2d 12 (1980).

¶20    Fennell argues that there was no probable cause to search the Kyocera cellphone because "there was no nexus between the cellphone … and the homicide." He points to the fact that the warrant application "did not state that Mr. Fennell had this phone with him during the shooting event," and he argues that the fact that Velazquez possessed the phone at the hospital suggests that it was not in Fennell's possession at the time he was shot.

¶21    Fennell's argument appears to be based on an unfounded premise—that there cannot be a "fair probability" that evidence related to the homicide would be found on the Kyocera cellphone if Fennell did not have the phone in his physical possession when the "shooting event" occurred. We disagree with this underlying premise, which is not supported by any of the authorities that Fennell cites in his briefs. We conclude that the issuing magistrate had a substantial basis for concluding that there was a fair probability that a search of the Kyocera cellphone would uncover evidence of wrongdoing for the following reasons.

¶22    First, there was probable cause to believe that Fennell had been injured in a shootout with T.H., and Fennell does not appear to challenge this conclusion. As stated in Detective Johnson's affidavit, the information known to police suggested that Fennell and T.H. were shot at the same time and in the same location. This information came from Velazquez, who was with Fennell before

and after shots were fired and drove Fennell to the hospital minutes later. This was corroborated by the hospital security footage, which showed Velazquez's vehicle arriving at the hospital just four minutes after police were dispatched to the scene of T.H.'s murder, from a direction consistent with 84th and Congress. Velazquez confirmed the location of the shooting, and said that she heard gunshots coming from two or three guns.

¶23 Second, officers had reason to believe that the Kyocera cellphone belonged to Fennell. As documented in Detective Johnson's affidavit, Velazquez gave the phone to the officers interviewing her, and she told the officers that it belonged to Fennell. Fennell does not challenge that Velazquez's statement provided probable cause that the Kyocera phone belonged to him.

¶24 Third, based on the facts discussed above, there is a fair probability that Fennell had access to the Kyocera phone in the hours leading up to the homicide. As stated above, Velazquez and Fennell were in the car together in the early morning hours of November 22, 2015, both before and after T.H. and Fennell were shot. Fennell was suspected in a crime, and there is a fair probability that he used his phone to communicate with others about the commission of that crime. This remains true even if the phone had been in Velazquez's car at the precise moment that T.H. and Fennell were shot, or if Fennell had asked Velazquez to keep the phone in her purse.

¶25 Finally, Detective Johnson's affidavit explained that, in his experience, cellphones often contain information relevant to the commission of a crime, including "the contact information for co-conspirators and associates," and "text messages and emails discussing crimes and inquiring about law enforcement efforts and news reports." Fennell does not attempt to refute any of these points.

He instead argues that "all cellphones theoretically could contain evidence of a crime," and that the logic behind the issuance of the search warrant in this case could extend to anyone else's cellphone. This argument fails to account for the fact that Fennell was himself at the scene of the crime, was a suspect in the homicide, and had access to the phone in the hours leading up to the homicide. These particular facts supply the nexus between the crime and the phone that officers wanted to search.

¶26 For these reasons, we conclude that the issuing magistrate made a commonsense determination that there was probable cause that a search of the Kyocera cellphone would uncover evidence linked to the commission of a crime. *See Silverstein*, 378 Wis. 2d 42, ¶22. We now address Fennell's remaining arguments to the contrary.

¶27 Fennell argues that any nexus between the Kyocera cellphone and the crime is undermined by the affiant's failure to mention that Fennell had a second cellphone in the pants pocket of the clothing he wore to the hospital. We are not persuaded. It is not clear from the record when officers became aware of the existence of a second phone, and we cannot determine whether it was before or after they sought the search warrant. Either way, the existence of a second phone does not undermine a finding of the probable cause to search the Kyocera cellphone. At most, there would have been probable cause to search the contents of both phones.

¶28 Fennell next cites *Riley v. California*, 573 U.S. 373 (2014). He argues that "[m]odern cellphones are not just another technological convenience," and that, "[w]ith all they contain and all they may reveal, they hold for many Americans the privacies of life." We agree. That is why, in most circumstances,

11

we require police to obtain a warrant from a neutral and detached magistrate before searching a cellphone. *Id.* at 382; *see also* **State v. Carroll**, 2010 WI 8, ¶27, 322 Wis. 2d 299, 778 N.W.2d 1. However, once law enforcement has gone through the warrant process and successfully obtained a warrant from such a magistrate, courts should not apply a "'grudging or negative attitude'" when reviewing a magistrate's decision to issue a warrant, nor should a reviewing court invalidate a warrant "'by interpreting the affidavit in a hypertechnical, rather than commonsense, manner.'" **Higginbotham**, 162 Wis. 2d at 991, 992 (citations omitted); *see also* **Carroll**, 322 Wis. 2d 299, ¶52.

¶29     Fennell's final argument to the contrary is that the search warrant was overbroad because it did not limit the search of the Kyocera phone to specific types of data and a specific time frame. However, an overbroad search warrant "'can be cured by redaction.'" **State v. Sveum**, 2010 WI 92, ¶38, 328 Wis. 2d 369, 787 N.W.2d 317 (citation omitted). In so doing, a court will strike from the warrant "'those severable phrases and clauses that are invalid for lack of probable cause or generality,'" and it will preserve "'those severable phrases and clauses that satisfy the Fourth Amendment.'" **Id.** (citation omitted). As a result, even if the warrant to search the phone should have been limited to certain kinds of data or a specified time frame, Fennell does not explain why this would require the suppression of text messages that were sent in the hour and a half immediately before the homicide. Accordingly, we address this underdeveloped argument no further. *See State v. Pettit*, 171 Wis. 2d 627, 632, 492 N.W.2d 633 (Ct. App. 1992) (we need not address arguments that are insufficiently developed).

12

## B. Prejudice

¶30     To establish prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* at 694.  Where, as here, the defendant fails to show that his trial counsel rendered deficient performance, we need not address prejudice. *Id.* at 700.  Even so, we pause to explain why we agree with the circuit court's conclusion that Fennell was not prejudiced by trial counsel's failure to attempt to suppress the text messages.

¶31     Jackson and Fennell presented conflicting narratives at trial about whether they had made an agreement to burglarize T.H.  Fennell argues that the case turned into a credibility contest between Jackson and Fennell and that the text messages were the lynchpin in the case against him.

¶32     We agree with Fennell that the text messages constituted strong evidence that he and Jackson had agreed to a plan to rob T.H.  We also agree that, based on the text messages, the jury could have inferred that the version of events presented by Jackson's testimony was closer to the truth than the version of events presented by Fennell's testimony.

¶33     However, the text messages were not the only strong evidence implicating Fennell in the homicide—there was other equally strong evidence that was entirely independent from the search of the Kyocera cellphone.  Among other things, Fennell told police on multiple occasions that he had been robbed and shot by masked men near 10th and Keefe; he denied that he had been near 84th and Congress until after he learned that police had DNA evidence placing him at the scene of the homicide.  The jurors could have inferred that Fennell fabricated the story about masked men, and based on this fabrication, they could have drawn an

inference of guilty knowledge. *See State v. Kreuser*, 91 Wis. 2d 242, 249, 280 N.W.2d 270 (1979). Additionally, T.H.'s wife testified that a man in a red hoodie knocked on her door several hours before her husband was shot and then claimed to have pressed the wrong doorbell; hours later, Fennell was admitted to the hospital wearing a red hooded sweatshirt with a combination of his and T.H.'s blood on it. Perhaps most damning is that T.H.'s DNA was found under Fennell's fingernails. When asked to explain this fact, Fennell testified that he bumped into T.H. as he was running away from a shootout, but the jury would have been left questioning how such an encounter could have resulted in T.H.'s DNA being transferred to Fennell's fingernails. Based on all the above, we agree with the circuit court that "there is no reasonable probability that the outcome of the trial would have been different" without the text messages.

¶34    In sum, we agree with the circuit court that the record conclusively demonstrates that Fennell is not entitled to a new trial based on his claim of ineffective assistance of counsel. Accordingly, the court properly denied his postconviction motion without holding a *Machner* hearing. *Bentley*, 201 Wis. 2d at 309-10; *Allen*, 274 Wis. 2d 568, ¶9.

## II. Sufficiency of the Evidence

¶35    We now turn to Fennell's challenge to the sufficiency of the evidence to support his conviction. In reviewing such a challenge, we consider the evidence "in the light most favorable to the State," and we will not reverse the conviction unless the evidence is so lacking "in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990). If more than one reasonable inference can be drawn

from the evidence, we will draw the inference supporting the verdict unless the evidence is incredible as a matter of law. *State v. Alles*, 106 Wis. 2d 368, 376-77, 316 N.W.2d 378 (1982).

¶36 Fennell argues that the evidence was insufficient to support his conviction. However, none of his arguments overcome the deference we give to jury verdicts.

¶37 First, Fennell argues that there was no evidence that he received the inculpatory text messages from Jackson on the morning of the homicide, and Fennell himself testified that he did not receive them. But Fennell does not explain why this matters. Even if the jury credited his testimony—which it was not required to do—the jury did not have to believe that Fennell actually received the messages to find him guilty of the charged offense. And, as Fennell implicitly acknowledges, the text messages provide strong contemporaneous evidence that Jackson believed he and Fennell had reached an agreement to rob T.H. This remains true even if Fennell did not actually receive the text messages that Jackson sent.

¶38 Second, Fennell argues that there was no physical evidence to show that he was the shooter in this case. Fennell points to evidence that shortly after 5:00 a.m., on the morning of the homicide, Jackson attempted to give his girlfriend a firearm and was very upset because he believed that Fennell had been killed in a shootout. According to Fennell, this evidence suggests that Jackson was at the crime scene and was the person who pulled the trigger.

¶39 This argument fails for two distinct reasons. The jury could have easily drawn a reasonable inference that Fennell shot T.H. based on the direct and circumstantial evidence provided by the State during the trial. But even if the jury

did not draw that inference, the jury was not required to find that Fennell pulled the trigger in order to convict him of first-degree reckless homicide as a party to a crime. A defendant charged as a party to a crime can be found guilty based on his co-actor's actions if the defendant knowingly assisted the person who committed the crime, or if the defendant was ready and willing to assist and the person who committed the crime knew of his willingness to assist. *See Mentek v. State*, 71 Wis. 2d 799, 805-06, 238 N.W.2d 752 (1976). Here, the text messages and Jackson's testimony provide powerful evidence that Jackson knew that Fennell was knowingly assisting Jackson with the plan to rob T.H. by gunpoint, and the evidence was sufficient to find that the actions by Fennell or his co-actors satisfy the elements of first-degree reckless homicide.[8]

¶40 Finally, Fennell argues that Jackson was the main witness against him, and his testimony was "patently incredible." The fact that Jackson and Fennell's testimony was inconsistent did not render Jackson's testimony incredible as a matter of law. *See State v. Vollbrecht*, 2012 WI App 90, ¶28 n.18, 344 Wis. 2d 69, 820 N.W.2d 443 (explaining that testimony is "inherently or patently incredible" if it is "'in conflict with the uniform course of nature or with fully established or conceded facts'" (citation omitted)). It instead meant that the jury was required to sort out the conflicts in their testimony and determine which story was more credible. It is the province of the jury, not an appellate court, to resolve

---

[8] There are four elements to reckless homicide: (1) that the defendant caused someone's death (2) by actions that created an unreasonable and substantial risk of death or great bodily harm, (3) that the defendant was aware of the risk and (4) that the circumstances showed utter disregard for human life. *State v. Edmunds*, 229 Wis. 2d 67, 75, 598 N.W.2d 290 (Ct. App. 1999). Fennell does not specifically challenge the sufficiency of the evidence to satisfy any of these elements.

conflicts in the evidence and decide whether to credit witness testimony. *Poellinger*, 153 Wis. 2d at 503.

¶41 In sum, there is ample evidence from which a reasonable jury could have convicted Fennell of first-degree reckless homicide as a party to a crime.

## CONCLUSION

¶42 For all the reasons above, we conclude that the circuit court did not err when it denied Fennell's postconviction motion without a hearing, and that the evidence was sufficient to support Fennell's conviction. We affirm.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.